342 F.3d 1361
 ALLOC, INC., Berry Finance N.V., and Valinge Aluminium, AB, Appellants,
v.
INTERNATIONAL TRADE COMMISSION, Appellee, and
Pergo, Inc., and
Roysol, and
Akzenta Paneele + Profile GmbH, and
Unilin Décor N.V., BHK of America, and Meister-Leisten Schulte, GmbH, Intervenors.
 No. 02-1222.
 No. 02-1291.
 United States Court of Appeals, Federal Circuit.
 DECIDED: September 10, 2003.
 Corrected September 22, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Daniel J. O'Connor, Baker & McKenzie, of Chicago, Illinois, argued for appellants. With him on the brief were David I. Roche, Jasmine C. Abdel-khalik, and Shima S. Roy.
 Clara Kuehn, Attorney, International Trade Commission, of Washington, DC, argued for appellee. On the brief were Lyn M. Schlitt, General Counsel; James M. Lyons, Deputy General Counsel; and Timothy P. Monaghan, Attorney. Of counsel were David I. Wilson, Michael Diehl, and Wayne Herrington, Attorneys.
 John M. DiMatteo, Wilkie Farr & Gallagher, LLP, of New York, New York, argued for intervenors Unilin Décor N.V., BHK of America, Meister-Leisten Schulte GmbH, and all other intervenors. On the brief were Eugene M. Gelernter, of Patterson, Belknap, Webb & Tyler LLP; Art C. Cody, of Wilkie Farr & Gallagher, LLP; and Laura M. Raisty, Adeel A. Mangi, and Daniel Ravicher, Patterson, Belknap, Webb & Tyler LLP, of New York, New York. Of counsel was Cecilia H. Gonzalez, Howrey, Simon Arnold & White, LLP, of Washington, DC. Also on the brief were Edward V. Filardi, Daniel A. DeVito, and Todd J. Tiberi, Skadden Arps Meagher & Flom, LLP, of New York, New York, for intervenor Pergo, Inc. Of counsel were David L. Cohen, Scott D. Lyne, and Douglas R. Nemec, Skadden Arps, etc. Also on the brief were Douglas V. Rigler, and L. Eden Burgess, Andrews & Kurth, LLP, of Washington, DC; and Andrew J. Patch, Young & Thompson, of Arlington, Virginia, for intervenor Roysol. Also on the brief were Ward B. Coe, III, Steven E. Tiller, and Gregory M. Stone, Whiteford, Tayler & Preston, L.L.P., of Baltimore, Maryland, for intervenor Akzenta Paneele + Profile GmbH. Of counsel was Edward H. Kim.
 Before MICHEL, RADER, and SCHALL, Circuit Judges.
 Opinion for the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge SCHALL.
 RADER, Circuit Judge.
 
 
 1
 In its Final Determination on Investigation No. 337-TA-443 under 19 U.S.C. § 1337 (section 337), the United States International Trade Commission (Commission) found no infringement of patent claims covering flooring products and methods of joining flooring products. In the Matter of Certain Flooring Prods., Inv. No. 337-TA-443, Notice of Final Initial Determination (Nov. 2, 2001) (Initial Determination); In the Matter of Certain Flooring Prods., Inv. No. 337-TA-443, Notice of Final Determination (Mar. 22, 2002) (Final Determination). Absent patent infringement, the Commission found no domestic injury under section 337 by the imported flooring products. Because the domestic producers, Alloc, Inc., Berry Finance N.V., and Valinge Aluminum AB (collectively, Alloc), cannot prove infringement of the properly construed claims, this court affirms.
 
 I.
 
 2
 Alloc filed a complaint with the Commission alleging the importation and sale of the accused flooring materials violated section 337. To show a violation of section 337(a)(1)(B) or section 337(a)(2), a complainant can prove three elements: (1) the importation of goods into the United States or sales of imported goods within the United States; (2) infringement by those goods or sales of a valid and enforceable United States patent; and (3) an industry in the United States marketing the patented articles. 19 U.S.C. §§ 1337(a)(1)(B) & 1337(a)(2) (2000).
 
 
 3
 Alloc owns the rights to U.S. Patent Nos. 5,860,267 (the '267 patent)[1], 6,023,907 (the '907 patent), and 6,182,410 (the '410 patent), which claim systems and methods of joining floor panels. Alloc alleged violation of section 337 by reason of infringement of these patents' claims. The asserted patents share the identical specification and all claim priority from the same Patent Cooperation Treaty (PCT) application, filed April 29, 1994, and a continuation of this PCT application, U.S. Application No. 08/436,224, filed May 17, 1995, now issued U.S. Patent No. 5,706,621.
 
 
 4
 Alloc asserted that Intervenors Pergo, Inc. (Pergo), Roysol, Akzenta Paneele + Profile, GmbH (Akzenta), Unilin N.V. (Unilin), and Meister-Leisten Schulte, GmbH (Meister) all imported flooring products that infringe claims in the '267, '907, and '410 patents. With the exception of Roysol, the Intervenors admitted importation of the accused flooring products, but denied infringing the asserted patents. By order dated July 10, 2001, the administrative judge made an initial determination, which found that Alloc had shown the existence of a domestic industry marketing the patented products — the third requirement under section 337. The administrative judge convened an evidentiary hearing on patent infringement.
 
 
 5
 Claim 19 of the '267 patent, claim 1 of the '907 patent, and claim 1 of the '410 patent are representative of the asserted claims from each patent and state (emphases added)[2]:
 
 
 Claim 19 of the '267 patent
 
 
 6
 A method for laying and mechanically joining rectangular building panels in parallel rows, the method comprising the steps of:
 
 
 7
 a) placing a new one of the panels adjacent to a long edge of a previously laid first one of the panels in a first row and to a short edge of a previously laid second one of the panels in an adjacent second row, such that the new one of the panels is in the second row, while holding the new one of the panels at an angle relative to a principal plane of the first panel, such that the new one of the panels is spaced from its final longitudinal position relative to said second panel and such that a long edge of the new panel is provided with a locking groove which is placed upon and in contact with a locking strip at the adjacent long edge of the first panel; b) subsequently angling down the new one of the panels so as to accommodate a locking element of the strip of the first panel in the locking groove of the new panel, whereby the new panel and the first panel are mechanically connected with each other in a second direction with respect to the thus connected long edges, wherein the long edges, in the angled down position of the new panel, are in engagement with each other and thereby mechanically locked together in a first direction also; and
 
 
 8
 c) displacing the new one of the panels in its longitudinal direction relative to the first panel towards a final longitudinal position until a locking element of one of the short edges of the new one of the panels and the second panel snaps up into a locking groove of the other one of the short edges, whereby the new one of the panels and the second panel are mechanically connected with each other in both in the first direction and in the second direction with respect to the thus connected short edges.
 
 
 Claim 1 of the '907 patent
 
 
 9
 A method of laying and mechanically joining floor panels in parallel rows, wherein relative positions of the panels during the method can be defined as including first and second mutual positions, a first mutual position in which (i) the two panels are held in an angled position relative to each other and (ii) upper portions of adjacent edges of the two panels are in mutual contact, and a second mutual position in which the two panels are (i) located in a common plane, (ii) mechanically locked to each other in a first direction that is at right angles to the common plane, (iii) mechanically locked to each other in a second direction, that is at right angles to said first direction and to the adjacent joint edges, as a result of a first locking member disposed at one of the adjacent edges being connected to a second locking member disposed at the other one of the adjacent edges, and (iv) being displaceable in relation to each other in the direction of the adjacent joint edges, wherein said method comprises the steps of:
 
 
 10
 a) bringing a new one of the panels into an intermediary position where (i) a previously laid first one of the panels is located in a first row, (ii) a second one of the panels is located in a second row and is in said first mutual position in relation to the first panel, and (iii) the new panel is located in the second row and is in said second mutual position in relation to the second panel and is in a position relative to the first panel such that a mutual distance is present between the upper portions of the adjacent joint edges of the new panel and the first panel;
 
 
 11
 b) while maintaining said second mutual position between the new panel and the second panel, displacing the new panel relative to the second panel into said first mutual position in relation to the first panel; and
 
 
 12
 c) angling the new panel and the second panel together into said second mutual position in relation to the first panel.
 
 
 Claim 1 of the '410 patent
 
 
 13
 An edge lock for use in a flooring system having a plurality of floor panels, the edge lock for mechanically and releasably locking together adjacent edges of pairs of adjacent floor panels during assembly of the flooring system and when said adjacent floor panels are laying flat on a subfloor with upper corner portions of said adjacent edges being mutually spaced apart, said edge lock comprising: locking means for forming a first mechanical connection for locking said adjacent edges to each other in a vertical direction, and for forming a second mechanical connection for locking said adjacent edges to each other in a horizontal direction at right angles to said edges, said locking means including:
 
 
 14
 (i) a locking groove extending parallel to and spaced from a first one of the adjacent edges of one of the adjacent floor panels and being open at a rear side of said one adjacent floor panel, and
 
 
 15
 (ii) a flexible and resilient locking strip integrated with another of the adjacent floor panels, said locking strip extending throughout substantially an entire length of an edge of the another adjacent floor panel, said locking strip being provided with a locking element projecting from the locking strip,
 
 
 16
 said locking means being constructed so as to operate as a one-way
 
 
 17
 snap lock in said horizontal direction during the assembly of said flooring system when displacing said adjacent edges towards each other by resiliently urging the flexible locking strip downwards until the upper portions of said adjacent edges have been brought into complete engagement with each other and the locking element thereby snaps into the locking groove to prevent drifting apart of said adjacent edges, and
 
 
 18
 said locking means also being constructed so as to enable said adjacent panels, while they are mechanically connected to each other by said first and second mechanical connections, to be turned in relation to each other about said upper corner portions of their locked-together edges in an angular direction so as to move the locking element out of the locking groove in order to unlock said one-way snap lock.
 
 
 19
 After considering the specification, prosecution history, and other relevant evidence, the administrative judge construed the claims to require "play" or a space between a locking groove on a first panel and the locking element of a panel adjacent to the first panel. The administrative judge construed the claim terms "locking means," "locking element," and "locking member" in view of 35 U.S.C. § 112, ¶ 6 to have structures requiring play. The administrative judge also construed the claims independently of § 112, ¶ 6 and arrived at essentially the same claim construction. In view of this construction, the administrative judge found no literal infringement by the imported products because he found that their locking systems did not include play. Without infringement, the administrative judge found that Alloc did not meet the domestic injury requirement of section 337. Therefore, the administrative judge absolved the intervenors of any violation of section 337 on November 2, 2001.
 
 
 20
 Alloc and the Commission's investigative staff filed petitions for review, contending the administrative judge erred in construing the claims. The Commission reviewed portions of the Initial Determination, and then issued a Final Determination, which agreed that all of Alloc's claims required the limitation of play. Alloc timely appealed to this court, and this court has jurisdiction under 28 U.S.C. § 1295(a)(6).
 
 II.
 
 21
 This court reviews legal determinations in section 337 investigations, such as claim construction, without deference. Checkpoint Sys., Inc. v. United States Int'l Trade Comm'n, 54 F.3d 756, 760 (Fed.Cir. 1995). This court reviews factual determinations for substantial evidence. 19 U.S.C. § 1337(c) (2000); 5 U.S.C. § 706 (2000). Infringement, whether literal or under the doctrine of equivalents, is a question of fact. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 28, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n, 109 F.3d 726, 731 (Fed. Cir.1997). Thus, an infringement determination will be upheld if supported by substantial evidence of record, which is defined to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1381 (Fed.Cir.1998).
 
 A. Claim Construction
 
 22
 In determining patent infringement, this court first examines the scope and meaning of the asserted patent claims. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed.Cir.1998). After all, the claims define the scope of an invention. SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 (Fed.Cir.1985) (en banc). "Claim language generally carries the ordinary meaning of the words in their normal usage in the field of invention" at the time of invention. Invitrogen Corp. v. Biocrest Mfg., L.P., 327 F.3d 1364, 1367 (Fed.Cir.2003). Thus, to determine claim meaning, a court immerses itself in the specification, the prior art, and other evidence, such as the understanding of skilled artisans at the time of invention, to discern the context and normal usage of the words in the patent claim. See, e.g., Hoechst Celanese Corp. v. BP Chems., Ltd., 78 F.3d 1575, 1579 (Fed.Cir.1996). Dictionaries and scientific treatises may also help supply the pertinent context and usage for claim construction. Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201, 1202 (Fed.Cir.2002); Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed.Cir.1999) Search Term End. Of course, a court must resist relying on any of these sources in a vacuum because they each influence the understanding of one of skill in the art at the time of invention — the standard for assessing claim meaning. DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1324 (Fed.Cir.2001). Moreover, the specification or the prosecution history of a patent may alter the meaning of a claim term from its conventional usage. A patent applicant may consistently and clearly use a term in a manner either more or less expansive than its general usage in the relevant art, thereby expanding or limiting the scope of the term in the context of the patent claims. Middleton, Inc. v. Minn. Mining & Mfg. Co., 311 F.3d 1384, 1388 (Fed.Cir.2002) (explaining that in order to disavow claim scope, a patent applicant must clearly and unambiguously express surrender of subject matter during prosecution); SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1342 (Fed.Cir.2001).
 
 
 23
 Turning to the Commission's finding that the claims include a "play" limitation, none of the asserted patent claims recites the term play.[3] Even so, the claims recite floor system features, which are emphasized in the claim language above, in which play is necessarily present. These features, and their associated claim terms, relate to "displacement" and "disassembly."
 
 
 24
 The '907 specification describes "the invention" under the heading "Technical Problems and Objects of the Invention," as "provid[ing] a system for making a joint along adjacent joint edges of two building panels, especially floor panels ... said system being characterized in that ... the panels, when joined together, can occupy a relative position in said second direction where a play exists between the locking groove and a locking surface on the locking element that is facing the joint edges and is operative in said second mechanical connection." '907 patent, col. 3, II. 59-61; col. 4, II. 6, 15-19 (emphasis added). Notably, the "objects of the invention are achieved by means of a panel-joining system having the features recited in the appended claims." '907 patent, col. 3, II. 56-58. The '907 specification repeats this point: "The above and other features and advantages of the invention will appear from the appended claims and the following description of embodiments of the invention." '907 patent, col. 6, II. 15-17. Thus, the specification teaches that the invention as a whole, not merely a preferred embodiment, provides for play in the positioning of floor panels.
 
 
 25
 The specification also teaches that play between components of the locking joint permits displacement, i.e., allows connected panels to slide relative to one another. '907 patent, Figure 1. Thus, the play in the joint enables displacement of floor panels to permit assembly of the panels in accordance with the installation method in Alloc's patents. According to the description of Figure 1, "[w]hen the panels 1 and 2 are joined together, they can however occupy such a relative position in the direction D2 that there is a small play between the locking surface 10 and the locking groove 14. This mechanical connection in the direction D2 allows mutual displacement of the panels 1, 2 in the direction of the joint, which considerably facilitates the laying and enables joining together the short sides by snap action." '907 patent, col. 7, II. 38-45. Thus, displacement, facilitated by play, permits assembly via snap action.
 
 
 26
 According to the '907 specification, play in the joint also permits "disassembly and reassembly of a floor previously laid without causing damage to the panels." '907 patent, col. 3, II. 48-50. In addition to minimizing the risk of damage to the panels, the system of the invention "can be assembled and disassembled much faster than in present-day systems, and any damaged or worn-out panels can be replaced by taking up and re-laying parts of the floor." '907 patent, col. 4, II. 54-57. The patent teaches that the preferred method of disassembly is to rotate the panels at an angle to one another without contact between their components. This method achieves disassembly "even if the aforementioned play between the locking groove and the locking surface is not greater than 0.2 mm." '907 patent, col. 5, II. 28-29. In addition to a first mechanical connection, the specification states that "the invention" provides for a second mechanical connection wherein "a play exists between the locking groove and a locking surface on the locking element that is facing the joint edges and is operative in said second mechanical connection." '907 patent, col. 4, II. 16-19. The second mechanical connection "is so conceived as to allow the locking element to leave the locking groove if the groove panel is turned about its joint edge angularly away from the strip." '907 patent, col. 4, II. 23-26. Thus, the second mechanical connection, in which play exists, permits release of the locking element upon turning the groove panel away from the strip projecting from the groove panel, essentially unlocking the snap lock assembly.
 
 
 27
 The '907 specification further criticizes prior art floor systems without play. '907 patent, col. 3, II. 1-21. The specification teaches that displacement of prior art panels is a "complicated operation" in systems having panels "tightly urged against each other," meaning displacement is hard to achieve in systems without play. '907 patent, col. 3, II. 10-12. Furthermore, disassembly and reassembly, which play facilitates, is unfeasible with these prior art systems. As the '907 specification explains, "it is not possible to disassemble a glued floor panel once laid, without having to break up the joints. Floor panels that have been taken up cannot therefore be used again.... Nor can damaged or worn-out panels be replaced without extensive efforts." '907 patent, col. 2, II. 26-32.
 
 
 28
 Moreover, all the figures and embodiments disclosed in the asserted patents imply play, or, as in the case of Figure 1b, expressly disclose play. Indeed, the patents do not show or suggest any systems without play. Thus, the '907 family of patents describe only flooring systems and methods of joining these flooring systems with play between the locking groove and the locking element.
 
 
 29
 In so concluding, this court recognizes that it must interpret the claims in light of the specification, Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), aff'd 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), yet avoid impermissibly importing limitations from the specification. Comark Communications v. Harris Corp., 156 F.3d 1182, 1186 (Fed.Cir.1998). That balance turns on how the specification characterizes the claimed invention. Sunrace Roots Enter. Co. v. SRAM Corp., 336 F.3d 1298, 1305 (Fed.Cir.2003). In this respect, this court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment. For example, it is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed.Cir.2002). On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims. SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1345 (Fed.Cir.2001).
 
 
 30
 Because the present case is factually similar to SciMed, this court's analysis in that case is instructive here. In SciMed, the court identified the sole claim construction issue to be "whether the common specification of the three patents limits the scope of the claims to catheters with coaxial lumens." Id. at 1340. The patentee argued that the claims should have been construed to include catheters with not only coaxial but also dual or side-by-side lumens. Id. But this court disagreed, finding:
 
 
 31
 At various points, the common specification of the three patents indicates that the claimed invention uses coaxial, rather than side-by-side lumens, i.e., that the guide wire lumen is contained within the inflation lumen and that the inflation lumen is annular. Read together, these portions of the common specification lead to the inescapable conclusion that the references in the asserted claims to an inflation lumen "separate from" the guide wire lumen must be understood as referring to coaxial lumens, and thus that the asserted claims read only on catheters having coaxial lumens.
 
 
 32
 Id. at 1342. Here too, the '907 specification read as a whole leads to the inescapable conclusion that the claimed invention must include play in every embodiment.
 
 
 33
 This court's analysis in Sunrace is similarly instructive, as the present facts are distinguishable. The parties' dispute centered on whether the claims included a cam as part of a shift actuator. In that case, the court found that the specification as a whole did not mandate that the claimed invention include a particular feature; instead, the court found that the patentee had clearly contemplated a shift actuator without a cam. Sunrace, 336 F.3d at 1304-5. It stated: "[N]othing in the written description indicates that the invention is exclusively directed toward cams or suggests that systems employing cams are outside the scope of the invention. Thus, while it is clear that the patentee was primarily focused on an embodiment of the invention using a cam, nothing in the patent limits the claims to that embodiment." Id. at 1305. Here, the '907 specification indicates that the invention is indeed exclusively directed toward flooring products including play. Moreover, unlike the patent-at-issue in Sunrace, the '907 specification also distinguished the prior art on the basis of play. Id.
 
 
 34
 Although the specification alone is sufficiently clear, the prosecution history of this patent family confirms the description in the specification of each patent, namely, that play is a key feature of the claimed invention. The PCT priority application included claims to a "system for providing a joint along adjacent joint edges ... of two building panels," the system having panels, when joined together, that "can occupy a relative position in said second direction (D2) where play () exists." The International Preliminary Examination Report (IPER) issued in the PCT application states that none of the documents cited in the International Search Report "describe a system where a play exists between the locking groove (14) and the locking element (8), where the connection allows mutual displacement of the panels in the direction of the joint edges and where the connection is so conceived as to allow the locking element to leave the groove (14) if the groove panel (2) is turned about its joint edge angularly away from the strip. The device is therefore novel." Thus, the IPER based its conclusion of novelty on the claim's recitation of play in the system joint.
 
 
 35
 During prosecution of the U.S. parent '621 patent application, the patentee represented to the United States Patent and Trademark Office (USPTO) that play is "important" because it enables displacement and disassembly of connected panels. Specifically, in response to a prior art rejection under 35 U.S.C. § 102(b), the patentee stated:
 
 
 36
 The claimed "play" of the present invention is important for two reasons. One, it enables the panels to slide movably with respect to each other along the direction of the joint edge, which is specifically claimed in the penultimate paragraph of claim 1. This movability allows the short ends of the panels to be placed adjacent each other when installing the floor. Second, the play further enables disassembly of the floor when required.... Trotter [the prior art] also does not teach or suggest the feature of the present invention that is defined in the last claim of claim 1, i.e., that the second mechanical connection enables the locking element to leave the locking groove if the groove panel is turned about its joint edge angularly way from the strip.
 
 
 37
 In response, the USPTO examiner allowed the claims over the Trotter reference, noting (emphases added):
 
 
 38
 The prior art of record fails to teach the use of adjacent joint floor paneling wherein the floor panels are interconnected by a locking element located within a groove formed on the underside in such a way so as to allow for displacement of the panels in a direction toward the joints and to allow for the locking member to be released from the groove when the panel is rotated about the joint.
 
 
 39
 Thus, like in the IPER, the USPTO relied on the patentee's statement distinguishing the invention from the prior art based on the invention's ability to displace panels ("slide movably") and to release adjacent panels by rotation about the joint. The applicant persuaded the USPTO that play enables these features. After gaining allowance of these claims, the patentee added new claims nearly identical to those allowed, except without the term play. The applicant did not, however, retract or modify the representations that secured allowance of the original claims. Instead, the applicant acknowledged:
 
 
 40
 New independent claim 22 is substantially the same as independent claim 1 except that it does not define the play that exists between the locking groove and the locking surface. As such, displacement of the panels is still facilitated in a direction along the joints which is what is believed to be meant by the Examiner's Statement of Reasons for the indication of allowable subject matter. (Emphasis added.)
 
 
 41
 As such, the applicant represented to the USPTO examiner that play facilitated its novel system set forth in the revised claims. Because the applicant invoked play to overcome the prior art, which lacked displacement and disassembly, Alloc cannot now contend that the '621 patent claims a flooring system and method for installing that system without play. The applicant expressly disavowed systems without play during prosecution of the parent '621 application. See Middleton, 311 F.3d at 1388.
 
 
 42
 Likewise, the independent claims of the '907, '410, and '267 patents incorporate the same limitations adopted by the applicant to secure allowance of the parent '621 patent. Augustine Med., Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1300 (Fed.Cir. 1999) (noting that the prosecution history of a parent patent application may limit the scope of a later patent application using the same claim term). The critical features of the parent '621 patent claims are also recited in the claims of its offspring. Each of the asserted patent claims recite locking members, locking elements, or locking means that permit displacement of panels or release of panels during disassembly. Specifically, the asserted '907, '410, and '267 patent claims require the displacement of floor panels, or floor panels that are displaceable in relation to each other.
 
 
 43
 Moreover, the system claims of the '410 patent require locking means that unlock adjacent floor panels by turning the panels in an angular direction to move the locking element out of its locking groove. To gain allowance of the parent patent claims over the prior art, the applicant insisted that play enables displacement and disassembly. Moreover, this feature distinguished the claimed flooring system over systems without play. All of the asserted child patents have specifications identical to the parent '621 specification. Thus, the limitations of the parent, as dictated by the specification's disclosure, apply as well to each of its children. Because play facilitates displacement and disassembly, as stated in the parent '621 patent file history, the asserted claims all require that feature.
 
 
 44
 The parties disagree as to whether this court should construe certain features of claims 1-3 of the '907 patent, claims 1, 26, 41 and 48 of the '410 patent, and claims 19, 23, and 39 of the '267 patent under 35 U.S.C. § 112, ¶ 6 as means-plus-function limitations. Claims 1-3 of the '907 patent recite the terms "first locking member" and "second locking member." The claims of the '410 patent recite the terms "locking means," "locking element," and "means for mechanically locking." The claims of the '267 patent recite the terms "first locking member," "second locking member," and "locking element." 35 U.S.C. § 112, ¶ 6 states:
 
 
 45
 An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.
 
 
 46
 35 U.S.C. § 112, ¶ 6 (2000). While typically considered in light of apparatus claims, § 112, ¶ 6 is also applicable to steps in a process claim. O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1583 (Fed.Cir.1997).
 
 
 47
 In this case, the outcome does not hinge on whether or not the claims are interpreted under 35 U.S.C. § 112, ¶ 6, as the critical factor, play, applies to claims of either flavor. The applicant emphasized the criticality of play during prosecution of the parent '621 application. This record informs the claims of its children as well. Whether those claims fall under the § 112, ¶ 6 regime or not, the patent applicant tethered the displacement and disassembly features of the claims to the play feature. Alloc cannot now obtain a claim construction under § 112, ¶ 6 disregarding play.
 
 B. Infringement
 
 48
 After construing the claims of the '907, '410, and '267 patents, the Commission compared the claims to the imported floor systems. Because the Commission correctly construed the claims to require play, Alloc relied on its expert, Mr. Limbert, to show play in the imported flooring systems. Nonetheless, the administrative judge found that none of the imported products exhibited play.
 
 
 49
 With respect to Unilin's system, the administrative judge discounted Mr. Limbert's analysis as flawed due to his reliance on drawings not depicting Unilin's product and faulty mathematical calculations. Initial Determination, slip op. at 90-92. The administrative judge rejected Alloc's arguments regarding play in Pergo's product because Alloc's sole basis for making these arguments was that Pergo's product contained the same joint as Unilin's product. Initial Determination, slip op. at 93. Thus, the reasons for rejecting Alloc's assertions against Unilin are equally applicable to Pergo. Alloc did not allege that Roysol's products possessed play. Initial Determination, slip op. at 94.
 
 
 50
 Alloc argued that manufacturing tolerances may result in pretension or play in Akzenta's flooring products. However, the administrative judge rejected this argument, because the design specifications and quality control practices of Akzenta prevent the introduction of play during manufacturing. According to Akzenta's expert, Dr. Blair, physical inspection of Akzenta's product confirmed the absence of play. Initial Determination, slip op. at 97.
 
 
 51
 Thus, the administrative judge carefully weighed the evidence of record, and found the Intervenor's arguments and expert testimony more persuasive than Alloc's. Based on this evidence, the administrative judge found no literal infringement of Alloc's claims by the imported flooring systems, as each system lacks the requisite play. This court generally defers to an agency as fact-finder in assessing the credibility of witnesses. See Hambsch v. Dep't of Treas., 796 F.2d 430, 436 (Fed.Cir.1986). Because the record supplies substantial evidence to support the administrative judge's factual findings, this court affirms the determination of no literal infringement. See Enercon, 151 F.3d at 1376.
 
 
 52
 Alloc contended that at least some of the Intervenors induced customers to install their imported flooring systems in manners resulting in infringement of the '907 and '267 patents. For example, Alloc argued that Unilin, Pergo, and Roysol provided installation instructions that require customers to follow the steps of Alloc's claimed methods. Alloc asserts that the Intervenors specifically intended to induce infringement of the '907 and '267 method claims.
 
 
 53
 Under principles of indirect infringement, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b) (2000). However, a patentee must show that an alleged infringer knowingly induced another to commit an infringing act to establish induced infringement under section 271(b). Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed.Cir.1990); C.R. Bard Inc. v. Advanced Cardiovascular Sys., Inc., 911 F.2d 670, 674-75 (Fed. Cir.1990) ("A person induces infringement under 271(b) by actively and knowingly aiding and abetting another's direct infringement."). Here, the administrative judge found no evidence that the Intervenors intended to induce others to infringe the asserted patents. More importantly, the administrative judge found no evidence of direct infringement, which is a prerequisite to indirect infringement. Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1318 (Fed.Cir.2003) ("Because this court upholds the verdict that claim 28 of the '494 patent is not directly infringed, the trial court correctly determined that FPS does not indirectly infringe that claim.); Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir.1986) ([T]here can be no inducement of infringement without direct infringement by some party."). This court finds no reason to disturb the administrative judge's conclusion on inducement.
 
 
 54
 Contributory infringement prohibits importation into the United States of a component or apparatus for use in a patented process that has no use except through practice of the patented method. C.R. Bard, 911 F.2d at 674. The statute sets forth contributory infringement in section 271(c):
 
 
 55
 Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
 
 
 56
 35 U.S.C. § 271(c) (2000). In this case, the administrative judge found that the imported flooring had substantial noninfringing uses. The record showed that the accused flooring products could be installed by methods not claimed in the '267 and '907 patents. Initial Determination, slip op. at 104-07. For instance, the installation instructions for Unilin's floor product are a noninfringing "snap-snap" method. Alloc's expert, Mr. Wennerth, admitted that Pergo's installation instructions describe a noninfringing method of installing Pergo flooring. Akzenta's published PCT application also discloses noninfringing methods of installing its floor products. After weighing this evidence, the administrative judge found no basis for contributory infringement. Initial Determination, slip op. at 107. The record amply supports the administrative judge's determination of noninfringement, and this court finds no reason to alter the decision of the administrative judge.
 
 C. Validity
 
 57
 The criteria set forth in section 337 require not only proof of patent infringement, but also a showing that the infringed patent is valid and enforceable. 19 U.S.C. § 1337(a)(1)(B)(i) (2000). Akzenta argued that Alloc's '907, '410, and '267 patents would be invalid if construed not to require play. In addition, Roysol argued that Alloc's patents are unenforceable due to misuse. Initial Determination, slip op. at 118-19. Because the claims were construed to require play, the administrative judge did not reach the issue of invalidity over the cited art. With respect to the misuse allegation, the administrative judge found that Roysol did not meet its burden in establishing the elements of patent misuse by Alloc. Id. This court affirms those rulings.
 
 D. Domestic Industry
 
 58
 A requirement of a patent-based section 337 action is that a domestic industry "relating to the articles protected by the patent ... exist[ ] or [be] in the process of being established." 19 U.S.C. § 1337(a)(2). To determine whether an industry relates to the protected articles (the "technical prong" of the domestic industry requirement), the Commission examines whether the industry produces articles covered by the asserted claims. The test for satisfying the "technical prong" of the industry requirement is essentially same as that for infringement, i.e., a comparison of domestic products to the asserted claims. Corning Glass Works v. United States Int'l Trade Comm'n, 799 F.2d 1559, 1563 (Fed.Cir.1986).
 
 
 59
 The administrative judge found that Alloc satisfied the economic prong of domestic industry. Initial Determination, slip op. at 2. However, based on the claim construction of the patents at issue, the administrative judge concluded that Alloc did not practice the patents at issue. The products sold by Alloc in the relevant United States market are not covered by any of the asserted patent claims because Alloc sells flooring systems without play. Initial Determination, slip op. at 110-15.
 
 
 60
 Alloc does not contend on appeal that its products exhibit play. Instead, Alloc presents arguments that three of its products marketed in the United States can be installed using a hammer and tapping block, which eliminates play. Thus, Alloc makes no attempt to establish a domestic industry in light of claim construction requiring play. Alloc essentially concedes that it cannot show a domestic industry exists under a claim construction requiring its flooring systems to have play. Therefore, Alloc cannot make out a section 337 violation in the instant case for lack of the domestic injury component of the charge.
 
 CONCLUSION
 
 61
 The Commission properly construed the asserted claims of the '267, '907, and '410 patents. Because that construction precludes Alloc from showing infringement by the Intervenors, no injury to a domestic industry has occurred. Therefore, this court affirms the Commission's final determination.
 
 COSTS
 
 62
 Each party shall bear its own costs.
 
 
 63
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 The '267 patent is a divisional of the '621 patent. The '907 patent is a continuation of the '267 patent, and the '410 patent is a continuation of the '907 patent
 
 
 [2]
 As will become apparent, the emphasized claim terms relate to an essential feature of the invention: play
 
 
 [3]
 Because the asserted patents all share the same specification, all references to the '907 patent should be understood as being applicable to the '410 and '267 patents as well
 
 
 
 64
 SCHALL, Circuit Judge, dissenting.
 
 
 65
 The majority affirms the Final Determination of the United States International Trade Commission ("Commission") that the Intervenors do not infringe United States Patent Nos. 5,860,267 (the "'267 patent"), 6,023,907 (the "'907 patent"), and 6,182,410 (the "`410 patent"), which claim systems and methods of joining floorboards and which are owned by Alloc.[1] The majority concludes that the Commission correctly construed the claims at issue as requiring "play," or space between a locking groove on a first panel and a locking element of a panel adjacent to the first panel. The Commission's determination of non-infringement resulted from that claim construction because none of the Intervenors' accused products exhibit the required play. I respectfully dissent. I do so because I am unable to agree with the majority that play is a limitation of the claims at issue.
 
 
 66
 The majority arrived at the conclusion that the asserted claims require play by relying on statements made by the patentee in the '907 patent specification.[2] The statements identified in the majority's opinion describe play and criticize prior art flooring systems. The majority concludes that these statements compel it to limit the scope of the claims. It further relies on the prosecution history of a parent patent common to the asserted patents, United States Patent No. 5,706,621 (the "'621 patent"). It does so for confirmation of its decision to restrict the asserted claims.
 
 
 67
 It is always important to bear in mind controlling claim construction principles. Claim interpretation begins with the intrinsic evidence, i.e., the claims themselves, the written description, and, if in evidence, the prosecution history. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed.Cir.2002). The terms used in a claim bear a "heavy presumption" that they have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. Id. at 1366. An accused infringer may overcome this "heavy presumption" and narrow a claim term's ordinary meaning, but it may not do so by pointing to a preferred embodiment disclosed in the specification or prosecution history. Id. In my view, the majority has allowed the accused infringer to narrow the scope of the claims to a preferred embodiment disclosed in the specification.
 
 
 68
 I begin with the language of the claims. As the majority points out, the asserted claims do not expressly recite play. On appeal, the Intervenors argue that, despite this omission, the claim terms "displace" and "disassemble" require that the mechanical connections between the floorboards have play.[3] They further argue that the claim terms "locking member," "locking groove," "locking strip," and "locking element" are means-plus-function terms and that the only corresponding structure disclosed in the specification is a flooring system that includes play. I only analyze the disputed claim terms. Vivid Techs., Inc. v. American Science & Eng'g, Inc., 200 F.3d 795, 803 (Fed.Cir.1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").
 
 
 69
 I turn first to the term, "displace," which is recited in claim 1 of the '907 patent in the two following phrases: "the two panels are ... displaceable in relation to each other in the direction of the adjacent joint edges" and "displacing the new panel relative to the second panel."[4] '907 patent, col. 10, II. 50 & 65-66. The ordinary meaning of the term "displace" is "to remove from the usual or proper place." Merriam Webster's Collegiate Dictionary 335 (10th ed.1999); See Texas Digital Sys., Inc. v. Telegenix Inc., 308 F.3d 1193, 1202 (Fed.Cir.2002) (holding that a court may consult a dictionary, encyclopedia, or treatise to help inform the court of the ordinary meaning of a word). In the patents' context, when one displaces a floorboard, one slides the board relative to an adjacent board. Thus, the ordinary meaning of this term is not restricted to flooring systems that have play.
 
 
 70
 Regardless, a court may restrict the ordinary meaning of a claim term in one of four ways. CCS Fitness, 288 F.3d at 1366. First, a claim term will not receive its ordinary meaning if the patentee acted as his or her own lexicographer and clearly set forth a definition of the disputed term in either the specification or prosecution history. Id. at 1366. Second, a claim term also will not receive its ordinary meaning if the term "chosen by the patentee so deprives the claim of clarity" as to require resort to other intrinsic evidence for a definite meaning. Id. at 1367. Third, if the patentee phrased a claim term in means-plus-function format, the term will only cover the corresponding structure disclosed in the specification, as well as equivalents thereto. Watts v. XL Sys., Inc., 232 F.3d 877, 880-81 (Fed.Cir. 2000). Finally, and most relevant to this case, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee limited the scope of the claims. Id. at 882 ("One purpose for examining the specification is to determine if the patentee has limited the scope of the claims."); Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1252 (Fed.Cir. 2000) (stating that the prosecution history may only be used to restrict the claims if it includes a clear and unmistakable exclusion or restriction of the claims).
 
 
 71
 The Intervenors, on appeal, do not argue that Alloc set forth a definition of the term "displace" in either the specification or the prosecution history requiring us to deviate from the plain meaning of the term. They also do not argue that the term "displace" deprives the claims of clarity requiring resort to other intrinsic evidence for a definite meaning. Additionally, there is no contention that the term "displace" is expressed in means-plus-function language. Rather, the parties dispute whether the patentee limited the meaning of the term through statements made in the specification of the '267, '907, and '410 patents or in the prosecution history of the '621 patent. I remain unconvinced that the intrinsic evidence shows that Alloc limited the scope of the claims.
 
 
 72
 The majority relies on several statements in the patent specification to limit the claims to systems and methods of joining floorboards that have play. In my view, the majority erroneously imports a play limitation into the claims from the common specification of the three patents at issue. Doing so contravenes our well-established doctrine prohibiting the addition of such limitations. Comark Communications v. Harris Corp., 156 F.3d 1182, 1186 (Fed.Cir.1998). As we have noted in the past, there is a very fine line between "examining the specification [ ] to determine if the patentee has limited the scope of the claims," see Watts, 232 F.3d at 882, and improperly importing a limitation from a patent specification into a claim, see Comark, 156 F.3d at 1186. A specification may only be used to limit a claim if a patentee has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed.Cir. 2002). In my view, the specification does not include any expressions of manifest restriction requiring us to limit the claims.
 
 
 73
 The majority identifies three statements in the specification where play is discussed. The first statement provides, in pertinent part, as follows:
 
 
 74
 Thus, the invention provides a system for making a joint along adjacent joint edges of two building panels, especially floor panels, ... said system being characterized in ... that the panels, when joined together, can occupy a relative position in said second direction where a play exists between the locking groove and a locking surface on the locking element that is facing the joint edges and is operative in said second mechanical connection....
 
 
 75
 '907 patent, col. 3, II. 59-67 & col. 4, II. 15-19. This statement does not evince an expression of manifest restriction to systems or methods of joining floorboards that have play, nor is it a clear disavowal of claim scope. The statement does not describe a method of joining floorboards. Rather, it refers to just one embodiment, specifically, a system of floorboards that has play. Therefore, it cannot be used to limit the methods claimed in the '907 and '267 patents. It also cannot be used to limit the systems claimed in the '410 patent because the statement employs the word "can." "Can" and "may" are commonly used by patentees to show that a limitation is permissive. Even if we interpret the word "can" to mean "are able to," as the administrative judge interpreted it, the statement still is permissive and does not require that play exist between two floorboards.
 
 
 76
 We have, in the past, relied on statements made in a patent specification to restrict a claim's scope. Such statements have, for example, identified a structure and stated that the structure was employed "for all embodiments of the present invention contemplated and disclosed here in." SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343 (Fed.Cir.2001). The statements, however, have always been clear expressions of manifest exclusion or restriction. We have also found claims to be limited in cases where a patentee described only those embodiments that included a particular feature and expressly distinguished the invention over prior art based on the fact that the prior art lacked the identified feature. See O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1581 (Fed.Cir.1997).
 
 
 77
 In this case, the statement from the '907 patent specification is not a clear expression of manifest restriction that requires all embodiments to have play or that limits the claims to only those systems of floorboards that have play. Neither is this a case, as the majority suggests, where only one embodiment is disclosed and where the patentee criticized prior art because it does not include play. I think the majority's contention that the patentee criticized prior art systems without play is misplaced. The prior art reference, to which the majority refers, Swedish reference SE 450,141, discloses panels that are held together by mechanical clips on the underside of the panels. The '907 patent also discusses prior art systems that use glue to hold adjacent panels together. '907 patent, col. 2. II. 25-27. The patent criticizes these systems for several reasons, but most importantly because their panels are not displaceable once they have been assembled and cannot be disassembled without being damaged. Id. at col. 3, II. 1-21. These systems are not displaceable and cannot be disassembled because their panels are mechanically or chemically held together, not merely because there is no space between the locking groove and locking element. The '907 patent does not criticize these prior art systems, which use mechanical clips and glue, for lacking play. The patentee's statements do not evidence an attempt to disclaim systems and methods of joining floorboards that do not have play.
 
 
 78
 The second statement cited by the majority is as follows:
 
 
 79
 In order to permit raking up previously laid, joined floor panels in a simple way, a preferred embodiment of the invention is characterized in that when the groove panel is pressed against the strip panel in the second direction and is turned anglularly [sic] away from the strip, the maximum distance between the axis of rotation of the groove panel and the locking surface of the locking groove closest to the joint edges is such that the locking element can leave the locking groove without contacting the locking surface of the locking groove. Such a disassembly can be achieved even if the aforementioned play between the locking groove and the locking surface is not greater than 0.2 mm.
 
 
 80
 '907 patent, col. 5, II. 18-29. This statement is made with respect to a preferred embodiment. The preferred embodiment relates to the disassembly of a floorboard system that has play of 0.2mm or more.[5] As noted, disassembly is not required by most of the asserted claims, and statements, such as this one, relating to disassembly do not inform our construction of the term "displace."[6]
 
 
 81
 Since two of the asserted claims require disassembly through unlocking adjacent panels or through a locking element leaving a locking groove, the parties dispute the meaning of disassembly. In my view, it also does not require a play limitation. Although the specification refers to play with respect to disassembly, the reference is in a preferred embodiment that describes how to take up floor panels in a simple way where the locking groove does not contact the locking surface of the locking groove. '907 patent, col. 5, II. 18-29. The specification also discloses that the panels can be quickly and conveniently disassembled without reference to play. Id. at col. 4, II. 51-54. The second statement, therefore, does not limit the disputed claim terms.
 
 
 82
 The third statement cited by the majority is as follows:
 
 
 83
 When the panels 1 and 2 are joined together, they can however occupy such a relative position in the direction D2 that there is a small play Ä between the locking surface 10 and the locking groove 14. This mechanical connection in the direction D2 allows mutual displacement of the panels 1, 2 in the direction of the joint, which considerably facilitates the laying and enables joining together the short sides by snap action.
 
 
 84
 '907 patent, col. 7, II. 38-45. This statement should not be considered out of context. It should be read in light of the paragraph before it, which describes in some detail the locking members but does not describe play. Again, this statement uses the permissive "can," which suggests that play is not required. In addition, it uses the word "however," suggesting that the configuration is an alternative to the configuration described in the preceding paragraph. None of these statements utilize expressions of manifest restriction; therefore, they do not restrict the claims.
 
 
 85
 Finally, I turn to the claim terms "locking member," "locking groove," "locking strip," and "locking element." The Intervenors argue that these are means-plus-function terms because they do not recite sufficient structure to maintain the presumption that they are not 35 U.S.C. § 112, ¶ 6 claim terms. The word "means" is not used with respect to these terms in claims 19, 23, and 39 of the '267 patent or in claims 1 and 2 of the '907 patent, and therefore there is a presumption that section 112, ¶ 6 does not apply.[7] Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 703-04 (Fed. Cir.1998) ("[T]he failure to use the word `means' creates a presumption that § 112, ¶ 6 does not apply ..."). The presumption can only be overcome if the Intervenors show that the claimed term "fails to recite sufficiently definite structure or else recites a function without reciting sufficient structure for performing that function." CCS Fitness, 288 F.3d at 1369 (internal quotes omitted).
 
 
 86
 In this case, "to lock" is a function. However, a "lock" is a structure that took its name from its function. Personalized Media, 161 F.3d at 703 ("Many devices take their names from the functions they perform. The examples are innumerable, such as `filter,' `brake,' `clamp,' `screwdriver,' or `lock.'"). The term "member," as Alloc contends, means "a constituent part of a whole." Merriam Webster's Collegiate Dictionary 724 (10th ed.1999). It is well known in the mechanical arts that a lock typically has several parts that interconnect. Therefore, a locking member refers to a part of a lock and recites structure rather than function. The same is true for the terms "locking groove," "locking strip," and "locking element." As such, these terms maintain their ordinary meanings and do not require play.
 
 
 87
 The majority also relies on the prosecution history of the '621 patent application to support its conclusion that the '907 patent specification limits the asserted claims. I do not think, however, that the prosecution history evidences a clear and unmistakable exclusion or restriction of the claims, as required by our precedent. Bayer, 212 F.3d at 1252. Specifically, the majority relies on statements made by the inventor during prosecution of the '621 patent distinguishing the claims over a prior art reference called Trotter. The '621 patent claims that were pending at the time the statements were made (claims 1-20) included an express limitation of play. Therefore, the statement by the patentee that "Trotter also does not teach or suggest a system wherein two panels, when joined together, occupy a relative position where a play exists" is an accurate statement and does not relate to claims that do not include the same element. Statements such as these made during the prosecution of a parent application can only apply to continuation applications if the parent and child patents contain the same claim limitations. Biovail Corp. Int'l v. Andrx Pharms., Inc., 239 F.3d 1297, 1301 (Fed. Cir.2001) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."); see Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1339 n. 6 (Fed.Cir. 1998) (holding that this rule also applies to divisional applications). These particular statements, however, cannot apply to the '907, '267, or '410 patent claims because they do not share the express play limitation that was in claim 1 of the '621 patent at the time the statements were made. Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1306-07 (Fed.Cir.2001) ("Medtronic provides no plausible reason why the prosecution histories of either the '273 or '548 patents are relevant to the construction of claim 3 of the '233 patent. Notably, there are no common claim terms in dispute. Indeed, the present case involves the absence of a claim term.").
 
 
 88
 After the Examiner of the '621 patent application issued a Notice of Allowance, the inventor realized that he could remove the play limitation and his claims would still be novel over the prior art. This led him to add claims 21-23 to the '621 patent application. These claims excluded the limitation of play. The response to the Examiner's Office Action stated with respect to claim 22:
 
 
 89
 New independent claim 22 is substantially the same as independent claim 1 except that it does not define the play that exists between the locking groove and the locking surface. As such, displacement of the panels is still facilitated in a direction along the joints which is what is believed to be meant by the Examiner's Statement of Reasons for the indication of allowable subject matter. Accordingly, claim 22 is also patentable over the cited prior art.
 
 
 90
 These statements do not represent a clear and unmistakable disclaimer or restriction to systems that have play. To the contrary, they suggest that claim 22 does not require play. In fact, the doctrine of claim differentiation suggests that two claims that are identical except for one element presumptively differ in scope. Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1368 (Fed.Cir.2000) (stating that claim differentiation creates a presumption that each claim in a patent has a different scope). In this case, claim 1 and claim 22 are identical except that claim 22 excludes the play limitation. This suggests that they do in fact differ in scope. Moreover, the phrase, "play that exists," which concerns the majority, merely mirrors the language in claim 1 of the '621 patent and does not indicate that play in fact exists as an element of claim 22.
 
 
 91
 Even if these last statements do place a limit on claim 22, this limitation would not apply to the '907, '267, or '410 patent claims because they do not share a common term that has been limited. Instead, the patentee effectively imported a limitation into claim 22 through the prosecution history. Advanced Cardiovascular, 265 F.3d at 1306-07. The same limitation is not necessarily imported into to the subsequent claims in a related patent.
 
 
 92
 In light of this claim construction, I would vacate the Final Determination of the Commission that the Intervenors do not infringe the '267, '907, and '410 patents. In addition, I would remand the case to the Commission for further proceedings regarding infringement, validity, and domestic industry. Since the majority rejects this claim construction, I do not address those issues. To do so would be a mere academic exercise.
 
 
 93
 For the foregoing reasons, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 As the majority has done, in the interest of clarity, I refer to Alloc, Inc., Berry Finance N.V., and Valinge Aluminium, AB, collectively as Alloc
 
 
 [2]
 Again, as the majority has done, I refer only to the '907 patent specification throughout this opinion, except where otherwise indicated. The patent specifications of the '267, '907, and '410 patents are identical
 
 
 [3]
 While many of the claims require "displacement," most of the asserted claims do not require "disassembly." In fact, only claims 1 and 39 of the '410 patent require that adjacent panels be able to "unlock" or that a locking element be able to "leave" a locking groove. The word "disassemble" does not appear in the claims
 
 
 [4]
 The term "displace" is also employed in claims 19, 23, and 39 of the '267 patent and claims 1, 26, and 39 of the '410 patent. Claim 1 of the '907 patent, however, is representative of these claims
 
 
 [5]
 Even if play is required, as the majority holds, it should be defined for purposes of disassembly as a space of 0.2mm or more between a locking groove on a first panel and a locking element of a panel adjacent to the first panel. With respect to displacement, no limit on the amount of play is disclosed in the specification. As such, play should be defined as a space greater then 0mm that allows displacement. The majority points to no evidence, much less substantial evidence, that supports the Commission's finding of no literal infringement. 5 U.S.C. § 706
 
 
 [6]
 For example, the method recited in claim 1 of the '907 patent does not include disassembly as one of the claimed steps. Only claims 1 and 39 of the '410 patent claim an edge lock and a flooring system that allow disassembly of adjacent panels
 
 
 [7]
 Claims 1, 26, and 39 of the '410 patent do use the word "means."See Personalized Media, 161 F.3d at 703 (stating that the word "means" in a patent claim triggers a presumption that the element is expressed as a means-plus-function limitation). Claim 1 is representative and recites the function as (1) "forming a first mechanical connection for locking said adjacent edges to each other in a vertical direction" and (2) "forming a second mechanical connection for locking said adjacent edges to each other in a horizontal direction at right angles to said edges." '410 patent, col. 10, II. 42-46. The structure disclosed in the specification that corresponds to this function is the tongue and groove to form the first mechanical connection for locking the edges in the vertical direction and the locking strip and locking groove to form the second mechanical connection for locking the edges in a horizontal direction. Id. at col. 1, II. 36-37. See B. Braun Medical v. Abbott Labs., 124 F.3d 1419, 1424 (Fed.Cir.1997) ("Structure disclosed in the specification is `corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."). These structures, as discussed below, do not require play.