**Todd EMBS, Plaintiff,**

v.

**JORDAN OUTDOOR ENTERPRISES, LTD., et al., Defendants.**

No. 2:03–cv–00895.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 11, 2008.

David J. Dawsey, Michael James Gallagher, Gallagher & Dawsey Co LPA, Columbus, OH, for Plaintiff.

James Dodds Curphey, Bryan R. Faller, Porter Wright Morris & Arthur, Bruce Leroy Ingram, Vorys Sater Seymour & Pease, Columbus, OH, Daniel J. Warren, Russell A. Korn, Sutherland Asbill & Brennan LLP, Atlanta, GA, Rashmi V. Gupta, Russell C. Peterson, Thomas I. Ross, Marshall Gerstein & Borun, Chicago, IL, for Defendants.

## CLAIM CONSTRUCTION OPINION AND ORDER

MICHAEL H. WATSON, District Judge.

Plaintiff brings claims under 35 U.S.C. § 271, asserting defendants have been and still are infringing claims of his patents, U.S. Patent Nos. 5,727,253 (filed Mar. 26, 1996)("'253") and 5,924, 131 (filed Aug. 26, 1997)("'131")(collectively, "patents-in-suit"). This matter is before the Court on the parties' numerous claim construction briefs and exhibits thereto, as well as portions of the briefs filed in connection with the parties' summary judgment motions which pertain to claim construction.

### I. Background

Plaintiff Todd Embs owns the patents-in-suit. He brings this action against Jordan Outdoor Enterprises, Ltd. ("JOEL"), Cabela's, Inc. ("Cabela's"), Bass Pro Shop, Inc. ("Bass Pro"), Dick's Sporting Goods, Inc. ("Dick's"), and Robinson Outdoors, Inc. ("Robinson").

### A. Overview of patents-in-suit

The patents-in-suit are entitled "Process for Designing Camouflage Clothing." The specifications for the two patents-in-suit are identical. They disclose a realistic appearing camouflage system and the method for making it. The camouflage system uses multiple articles of clothing which, when worn together, mimic the appearance of a natural scene. The method involves taking a photograph of a natural scene where the camouflage is intended to be used. A portion of the image from the

photograph is imprinted on an article, such as pants. A different portion of the same photographic image is imprinted on a second article, such as a shirt. The two portions of the photographic image are aligned on the articles such that when they are worn together the elements of the natural scene appear substantially continuous from one garment to the next, and the imprinted image appears in approximately a one to one scale to the natural scene.

Figure 2 shows a drawing representative of the camouflage system. The imprinted image of a tree begins on the left pant leg, aligns with and continues on the shirt, and ends on the hat:

**FIG. 2**

The Figure 4 flow chart illustrates "the overall method used to design and create a camouflage system in accordance with the present invention." '131 Patent, col. 4, *l.* 10–12. The process begins with a photographer taking a photograph of a natural scene, such as a forest. The operator then transfers the photographic image to a computer. In the third step, the photographic image is modified and/or enhanced using graphics software. Next, the operator de-signs the clothing pattern pieces. The operator then selects and superimposes the portions of the photographic image on clothing pattern pieces using apparel pattern software. In the sixth step, apparel pattern software is used to drape the pattern pieces with respective image portions onto a three-dimensional model of a human form. After that, the operator compares the resulting representation with the original photograph to ensure proper pattern registration and continuity of pattern from one article of clothing to the next. If the comparison is not good, the process returns to the third step. If the comparison is good, the operator makes a low cost sample of the camouflage system. Afterwards, the operator creates a production sample. In the final step, a full production run of the camouflage system is made.

### B. Prosecution history

The application which resulted in the '253 Patent was filed on March 26, 1996. The application set forth fifteen Claims, five of which were independent claims. The Examiner allowed Claims 9–12, but rejected Claims 1–8 and 13–15. The Examiner found the Brown Realtree pattern on page thirty-eight of Cabela's 1994 Annual Fall Catalog anticipated Claims 1–6, 8, 13 and 14:

> [T]he Cabela's Catalog Brown Realtree camouflage pattern rainwear suit discloses a realistic appearing camouflage system including a first article of clothing, a jacket, having imprinted thereon a portion of a photographic image (a tree trunk and leaves) of a natural scene in substantially the same scale as a natural scene and a second article of clothing worn with the first article with a second portion of the photographic image printed thereon in the same scale as the natural scene and with the imprints of the first and second articles being so

located so that when they are worn together the scene is substantially continuous and reproduced both vertically and horizontally.

The Examiner explained her reasons for allowance of the remaining claims as follows:

> None of the cited references, alone or in combination, disclose the method of manufacturing a realistic appearing camouflage system comprising selecting a photograph with a first image and printing it on a first article of clothing; taking a second area of the photograph and placing it on a second article of clothing so that when the two articles are worn the image is continuous as claimed in Claim 9.

The '253 Patent was issued on March 17, 1998.

The Patentee filed the application which resulted in the '131 Patent on August 26, 1997, as a continuation of the application which resulted in the '253 Patent. In a preliminary amendment, the Applicant traversed the Examiner's rejection of claims on the basis of the Brown Realtree pattern: "The Brown Realtree rainwear has a crude drawn camouflage pattern with a random distribution of sketched leaves overlaying a simulated bark pattern.... The claimed invention, which uses photographic techniques to develop camouflage garments, overcomes the after said limitations of the prior art."

## II. Claim construction standards

After the instant case was filed, and after the parties had already submitted their first round of claim construction briefs, the United States Court of Appeals for the Federal Circuit rendered a pivotal decision on the issue of claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.Cir.2005). *Phillips* set forth guidelines to ensure consistency in the interpretation of patent claims.

Edward H. Phillips was issued a patent, U.S. Patent No. 4,677,798 (798), for his invention of "load-bearing, impact-resistant, and vandalism-resistant walls." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1309 (Fed.Cir.2005). These walls, useful particularly in building prisons, were comprised of "modular, steel-shell panels" that also insulated fire and noise. *Id.* In an effort to sell and market his invention, Phillips agreed to give his patent rights to AWH Corporation, Hopeman Brothers, Inc., and Lofton Corporation ("AWH") on a temporary basis. Shortly after this arrangement ended in 1990, Phillips received a sales brochure from AWH, sparking his suspicion that the corporation was continuing to use Phillips' trade secrets and patented technology without his consent. Over the next two years following the receipt of the brochure, Phillips sent letters to AWH accusing them of using his patented invention. In 1992, the letters ceased.

In February 1997, Phillips brought suit against AWH in the United States District Court for the District of Colorado alleging misappropriation of trade secrets and infringement of certain claims of the '798 patent. Pursuant to Colorado's three-year statute of limitations for trade secret misappropriation, the district court dismissed Phillips' first claim. The district court then granted summary judgment for AWH in respect to the infringement claim after determining Phillips could not prove patent infringement under the court's claim construction. At issue in the court's claim construction was the meaning of the term "baffles" in Claim 1 of the '798 patent. The relevant language from this claim is as follows:

> Building modules adapted to fit together for construction of fire, sound and impact resistant security barriers and rooms for use in securing records and

persons, comprising in combination, an outer shell ..., sealant means ... and further means disposed inside the shell for increasing its load bearing capacity comprising internal steel baffles extending inwardly from the steel shell walls. *Phillips,* 415 F.3d at 1310–11.

The district court interpreted the term "baffles" to fall under 35 U.S.C. § 112, ¶ 6, as "a means ... for performing a specified function." Title 35 U.S.C. § 112, ¶ 6 provides that a claim subject to its reach "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Phillips,* 415 F.3d at 1309. Therefore, the district court referred to the entire specification, looking for how it described "baffles" in all of its respective claims. The district court decided the specification showed " 'baffle deployment at an angle other than 90 to the wall faces,' " *Id.,* thus defining a baffle as used in the claim to " 'extend inward from the steel shell walls at an oblique or acute angle to the wall face.' " *Id.* Disagreeing with this restrictive interpretation, as well as the court's application of the statute of limitations, Phillips appealed.

A panel of the United States Court of Appeals for the Federal Circuit affirmed the district court's judgment. *Phillips v. AWH Corp.,* 363 F.3d 1207 (Fed.Cir.2004). The panel unanimously affirmed the district court's finding that the misappropriation of trade secrets claim violated the Colorado statute of limitations, and affirmed the patent infringement ruling by a majority on different grounds than the district court. The panel majority disagreed with the applicability of 35 U.S.C. § 112, ¶ 6 because "the asserted claims of the '798 patent contain[ed] a sufficient recitation of structure." *Phillips,* 415 F.3d. at 1310. Although the panel viewed the term "baffles" as structure, it still read the

term as excluding "structures that extend at a 90 degree angle from the walls." *Id.* The panel stated that the specification "repeatedly refer[red] to the ability .of the claimed baffles to deflect projectiles" and that it described the baffles as being "disposed at such angles that bullets which might penetrate the outer steel panels are deflected." *Id.* The panel reasoned that to perform this function, the baffle structure " 'must be oriented at angles other than 90.' " *Id.*

The judge dissenting from the panel's judgment argued the term "baffles" had a plain meaning, containing no restrictions as to the angle of extension from the wall. The dissenting judge mentioned precedent explicitly rejected the contention " 'if a patent describes a single embodiment, the claims of the patent must be construed as being limited to that embodiment.' " *Phillips,* 363 F.3d at 1217 (citation omitted). It was argued this precedent supplanted the panel's contention, and a limitation did not exist simply because the specification showed baffles only at angles other than 90 degrees.

The dissenting judge argued " 'baffles' are a 'means for obstructing, impeding, or checking the flow of something,' and that the panel majority had agreed that the ordinary meaning of baffles is 'something for deflecting, checking, or otherwise regulating flow.' " *Phillips,* 415 F.3d at 1310. He then concluded this was just one of the purposes of the invention, and precedent insisted not all the claims must be read as achieving every purpose of the invention. *Phillips,* 363 F.3d at 1217–18. Thus, if the panel had accepted the correct definition of the term "baffle," there would have been no restriction, and the summary judgment for AWH would have been reversed. *Phillips,* 415 F.3d at 1310.

The United States Court of Appeals for the Federal Circuit agreed to rehear the

appeal en banc. Upon reviewing the case, the en banc court affirmed the judgment that the trade secret misappropriation claim violated the statute of limitations, but reversed the patent infringement holding that had granted AWH summary judgment.

The en banc court agreed with the panel that the term "baffles" was not subject to 35 U.S.C. § 112, ¶ 6 because the claim "specifically identifie[d] 'internal steel baffles' as a structure," *Phillips*, 415 F.3d at 1311, and the absence of the word "means" in this description "create[d] a rebuttable presumption that section 112, paragraph 6, d[id] not apply." *Id.* The court recognized its responsibility was then to determine the "correct construction of the structural term 'baffles,'" and stated the "principal question ... [was] the extent to which [the court] should resort to and rely on a patent's specification in seeking to ascertain the proper scope of its claims." *Id.* at 1312. In answering this question, the court reaffirmed the basic principles for claim construction, providing clarification where needed.

The court identified four sources a court should reference when faced with claim construction: the words of the claims; the specification; the prosecution history; and extrinsic evidence. There is no rigid formula to follow for claim construction analysis, so the court emphasized the importance of "attach[ing] the appropriate weight" to each consulted source. *Id.* at 1324 (citation omitted). The main goal for the court's analysis is to understand the value and importance of each source, and use them accordingly to "comprehend how a person of ordinary skill in the art would understand the claim terms." *Id.*

The court began laying out the basic principles for claim construction by emphasizing the importance of plain meaning. Since a patentee is required to accurately and thoroughly describe the invention in the claim, the court reasoned interpretation should begin with plain meaning analysis, interpreting the claim "'from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312 (citation omitted). The court noted "plain meaning" meant the ordinary meaning as perceived by "a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. The court reasoned it is necessary to construe claims in the eyes of a person of ordinary skill in the field of the invention because they can understand the term's special meaning or unorthodox usage unbeknownst to a lay judge. *Id.*

Although the court recognized dictionaries can be useful at times when a claim term has a meaning "readily apparent even to lay judges ... the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and ... patentees frequently use terms idiosyncratically." *Id.* at 1314. Therefore, the court stressed the importance of referencing sources "'that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (citation omitted). The court stated that to interpret a claim term, a person of ordinary skill in the art would consult the words of all the claims, the remaining part of the patent specification, and the prosecution history. *Phillips*, 415 F.3d at 1313. According to the court, reviewing these sources at the start of analysis is a crucial step in interpreting claim language. *Id.*

The court stressed "the context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. It stated that other claims of the patent can be particularly useful to the court, and when analyzed, should be "'read in view of the specification, of which they are a part.'" *Id.* at 1315 (citation omitted). Reaffirming

the assertions of an earlier claim construction decision, the court noted that in addition the words of the claims, "the specification 'is the single best guide to the meaning of a disputed term.'" *Id.*

Title 35 U.S.C. § 112, ¶ 1 requires the specification to "describe the claimed invention in 'full, clear, concise, and exact terms.'" *Phillips,* 415 F.3d at 1316. The court asserted that this "statutory role" makes the specification an important and useful tool when interpreting claim language since "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* Because the specification is written by the patentee, the court explained it may contain important disclaimers or special definitions otherwise unknown even to a person of ordinary skill in the art. *Id.* In a case where the patentee reveals a special definition, the court stated that it is then the patentee's definition that governs as opposed to the term's normal, technical definition. *Id.* While emphasizing the importance of referencing the specification, the court suggested to also "consider the patent's prosecution history." *Id.* at 1317 (citation omitted).

The prosecution history includes all relevant information submitted to the Patent and Trademark Office ("PTO") for examination of the proposed patent, *Phillips,* 415 F.3d at 1317 (citation omitted), and "provides evidence of how the PTO and the inventor understood the patent." *Phillips,* 415 F.3d at 1317. The court reasoned that since the prosecution history portrays the inventor's original description of the patent, the court would be able to see whether the claim's scope was intentionally limited during the negotiation process between the patentee and the PTO. *Id.* The court, however, stated that evidence derived from the negotiation process

"often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Although evidence from the prosecution history may be helpful, the court suggested it may also be necessary to reference extrinsic evidence if further insight is needed into the meaning and scope of the claim.

The court made clear that extrinsic evidence should be referenced as a last resort when interpreting a patent claim. It stated "while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (citation omitted). The court noted extrinsic evidence included sources such as dictionaries, treatises, and expert testimony, all of which would result in unreliable interpretations if relied on too heavily. *Id.* at 1319. The court stated technical dictionaries may provide an idea as to how a term in the art would be used, but fail to take into account the explanation of the claim term by the patentee and the use of the language surrounding the term. *Phillips,* 415 F.3d at 1318.

Similarly, the court recognized expert testimony can be useful, but is not without its own share of shortcomings. The court suggested this testimony can be helpful "to a court for a variety of purposes, such as to provide background on the technology at issue . . . or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* However, the court warned this testimony runs the risk of being biased and should not be considered when "clearly at odds with the claim construction mandated by the [intrinsic evidence]." *Id.* (citation omitted). The court concluded by explaining extrinsic evidence is less reliable than other evidence, but "the court should keep in mind the flaws inherent in

each type of evidence and assess that evidence accordingly." *Id.* at 1319.

In its analysis of the utilization of extrinsic evidence, the en banc court in *Phillips* clarified the holding of *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed.Cir.2002)(relying extensively on the use of dictionaries, encyclopedias and treatises when determining the meaning of a claim term). The *Phillips* court explained *Texas Digital* relied too heavily on extrinsic sources, and improperly limited the relevance of the patent's specification. *Phillips,* 415 F.3d at 1320. The court stressed that using a dictionary focused on "the abstract meaning of words" instead of appropriately reading the term in context. *Id.* at 1321. The context surrounding the term can shed light on the meaning intended by the patentee, and the court reasoned using a dictionary runs the risk of overlooking this intended meaning. *Id.*

The court addressed *Texas Digital* because subsequent cases had been relying on its ruling to assign meanings to claim terms that were clearly contrary to the context of the patent's claim description. *Phillips,* 415 F.3d at 1321, Assigning such overly broad meanings was becoming a problem, and the en banc *Phillips* court wanted to make clear that the problem would be diminished by addressing the patent's intrinsic evidence before anything extrinsic. *Id.* The court suggested the meaning of the term when consulting the patent as opposed to extrinsic evidence would often render completely different results "because the patent by its nature describes something novel." *Id.* at 1322. The court concluded it was inappropriate to then assign a different meaning to a claim due to "the preferences of a particular dictionary editor." *Id.*

However, the court did not completely ban the consultation of extrinsic sources. As it noted in its explanation of the principles of claim construction analysis, the court recognized dictionaries could be helpful in "understanding the commonly understood meaning of words," and could be particularly helpful when the dictionary definition was consistent with the meaning "ascertained by a reading of the patent documents." *Id.* (citation omitted). Thus, the court cautioned that relying primarily on extrinsic sources could yield incorrect results, and that to remain consistent with the principles of claim construction, the ruling in *Texas Digital* is not to be followed.

After distinguishing and clarifying *Texas Digital,* the court also explained "that if a patent describes only a single embodiment, the claims of the patent [do not have to] be construed as being limited to that embodiment." *Phillips,* 415 F.3d at 1323 (citation omitted). The court was adamant in noting that requiring such a limitation has been expressly rejected before, and is thus rejected again. The court stated "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments," *Id.,* thus there would be no reason for the court to do so.

The court ended its analysis by stating that there is no magic formula to follow when interpreting a claim. *Id.* at 1324. The court stressed that the main goal in claim construction is "to increase the likelihood that a court will comprehend how a person of ordinary skill in the art would understand the claim terms," so the court set out an approach to assist courts in attaining that goal. *Id.* at 1324. The approach was not rigid nor complicated; rather, the court had "simply attempted to explain why . . . certain types of evidence are more valuable than others." *Id.* at 1324. The court then turned to the application of these principles to the issue at hand.

The court's task was to determine whether the term "baffles" in Claim 1 were limited to structures pointing inwardly from the load-bearing walls *at angles other than 90 degrees*. The first step the court took in its analysis of the term "baffles" was to look at the words of the claim. It determined that claim 1's language required the baffles be comprised of steel, be components of the load-bearing means for the wall, and be pointing inwardly from the walls. *Phillips*, 415 F.3d at 1324. In referencing the intrinsic evidence along with the dictionary, the court also determined a person of ordinary skill in the art would agree "that the term 'baffles' refer[red] to objects that check, impede, or obstruct the flow of something," which turned out to be the term's usual meaning. *Id.*

The court then turned to the specification in its entirety. Claim 17 "state[d] that baffles are placed 'projecting inwardly from the outer shell at angles tending to deflect projectiles that penetrate the outer shell.'" *Id.* at 1324–25. The court reasoned including this limitation "would be unnecessary if persons of skill in the art understood that the baffles inherently served such a function." *Id.* at 1325. The same logic holds true in claim 6, which states that baffles are to be situated at certain angles in order to serve as deflector panels. *Phillips*, 415 F.3d at 1325. The court reasoned "[i]f the baffles recited in claim 1 were inherently placed at specific angles, or interlocked to form an intermediate barrier, claim 6 would be redundant." *Id.*

Through its claims, the patent states that baffles serve numerous purposes. Among these purposes are deflecting impact from powerful weapons, providing structural support, and insulating heat and sound. *Id.* at 1325–26. The court conceded that to deflect projectiles, the baffles would have to extend from the walls at angles other than 90 degrees. However, the court noted that even though the baffles are meant to serve this purpose in one claim, it is not necessary for every claim to be construed as achieving every one of the objectives. *Phillips*, 415 F.3d at 1327 (*citation omitted*). Deflecting projectiles was just one function to be served by the structural baffles, and was not mentioned as an objective for the baffles described in claim 1. Thus, the court concluded "that a person of skill in the art would not interpret the disclosure and claims of the '798 patent to mean that a structure extending inward from one of the wall faces is a 'baffle' if it is at an acute or obtuse angle, but is not a 'baffle' if it is disposed at a right angle." *Id.*

The court, in its final thoughts, addressed AWH's contention that interpreting baffles as able to extend inwardly at 90 degree angles would render the claims invalid. *Id.* Acknowledging the maxim suggesting courts should interpret claims to preserve the claims' validity, the court stated that the maxim applies only in situations where the claim term is ambiguous even after its initial claim construction analysis. *Id.* The claim term "baffles" was no longer ambiguous in this case, and therefore the court decided it was unnecessary to determine whether the court's interpretation would render the claim invalid. *Id.* at 1328. The court did state that in cases where the application of this maxim is necessary, courts should "infer that the PTO would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity." *Phillips*, 415 F.3d at 1327. The court reversed the summary judgment of Phillips' noninfringement claims and remanded the claims to the district court to be decided in accordance with the court's findings. *Id.* at 1328.

## III. Discussion

Having set forth the applicable law, the Court will proceed to the task of claim construction. The Court will first address the issue whether the patents-in-suit exclude camouflage with repeating patterns. The Court will then analyze specific claim terms in the context of the parties' claim charts.

### A. Repeating pattern

■ Defendants assert the patents-in-suit exclude repeating patterns. In making this assertion, defendants argue the patents-in-suit set forth a single embodiment and the claims are limited to that embodiment. Defendants refer to the Figure 4 flow chart, which illustrates *"the overall method* used to design and create a camouflage system in accordance with *the present invention."* '131 Patent, col. 4, *l.* 10–12 (emphasis added). Furthermore, the Summary of the Invention provides, "[a] feature of the new method of *this invention* . . . includes photographing the selected scene so that the actual height of the scene photographed is substantially the height of the camouflage system." '131 Patent, col. 3, *l.* 31–36 (emphasis added). Defendants argue the specification and drawings disclose only one embodiment—a single, approximately life-size photographic image extending and aligning across the garments. Defendants maintain this single embodiment necessarily excludes camouflage made with a repeating pattern.

In the same vein, defendants argue the specification disclaims coverage of a repeating pattern. The Background section of the '131 Patent distinguishes prior art as follows:

Traditionally, camouflage clothing patterns take the form of a repeated pattern of a particular hue of shade, in an attempt to simulate the natural environment. Thus, in forest areas, camouflage clothing appears as intermingled light and dark shades of green, with some brown mixed in. The patterns are typically abstract shapes, the intent being to break up the human outline against the particular background, and the design from the pants to the shirts is discontinuous. However, these prior art camouflage patterns have not adequately mimicked the intended environment due to the unrealistic nature of the patterns and the discontinuity in camouflage pattern from one item of clothing, such as pants, to another item of clothing, such as a shirt.

'131 Patent, col. 1, *l.* 19–31.

In support of their contention the patents-in-suit are limited to a single embodiment, defendants rely primarily upon *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337 (Fed.Cir.2001) and *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed.Cir.2003). *SciMed* involved patents for balloon dilation catheters used in coronary angioplasty procedures. Catheters for this purpose contain two passageways, or lumens: a guide wire lumen and an inflation lumen. The issue in *SciMed* was whether the district court properly concluded "the common specification of the three patents limits the scope of the asserted claims to catheters with coaxial lumens" which have an annular structure. 242 F.3d at 1340. The accused devices in *SciMed* employed duel, or side-by-side lumens.[1]

---

1. The parties in *SciMed* agreed the only two arrangements of the two lumens practiced in the art were duel lumen configuration and the coaxial lumen configuration, the cross-section of which is annular in shape.

The plaintiff in *SciMed* argued the district court had committed one of the "cardinal sins" of patent law by "reading a limitation from the written description into the claims." 242 F.3d at 1340. The Federal Circuit in *SciMed* disagreed, observing the district court properly applied the directive: " 'Claims must be read in view of the specification, of which they are a part.' " *Id.* (quoting *Markman*, 52 F.3d at 979–80). The court further explained:

> Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.

*Id.* at 1341. Moreover, the *SciMed* court noted, " 'when the "preferred embodiment" is described as the invention itself, the claims are not entitled to a broader scope than that embodiment.' " *Id.* (quoting *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed.Cir.1999)).

The court in *SciMed* affirmed the judgment of the district court, holding the specification disclaimed the duel lumen configuration and limited the scope of the asserted claims to catheters with coaxial lumen structures with annular inflation lumens. 242 F.3d at 1340. In reaching this conclusion, the court examined four specific aspects of the specification. First, the abstract described the invention as including an inner core tube which defined a guide wire lumen, and an annular inflation lumen. *SciMed*, 242 F.3d at 1342. Second, the written description discussed the disadvantages of prior art catheters with duel lumens, which were typically larger than necessary, and stiffer than desired. *Id.* at 1342–43. Hence, the patents distinguished prior art on the basis of the use of

duel lumens. *Id.* at 1343. The court in *SciMed* agreed with the district court's conclusion that claims should not be read so broadly as to encompass distinguished prior art. *Id.*

Third, the Summary of the Invention described "the present invention" as using the coaxial configuration. The court found the characterization of the coaxial structures as part of the "present invention" strong evidence that the claims did not encompass the opposite configuration. *SciMed*, 242 F.3d at 1343. Lastly, the court in *SciMed* found the following portion of the specification most compelling:

> The intermediate sleeve structure defined above is the basic sleeve structure for *all embodiments of the present invention contemplated and disclosed herein*—namely, an inner core tube bonded to a distal portion of the main catheter shaft, with an outer sleeve forming an annular continuation of the inflation lumen through the main shaft between the core tube and outer sleeve.

242 F.3d at 1343. The *SciMed* court concluded the above-emphasized language to be a "broad and unequivocal" disclaimer of "subject matter that, absent the disclaimer, could have been considered to fall within the scope of the claim language." 242 F.3d at 1344.

*Alloc* involved patents for a method for laying and mechanically joining locking floor panels. As in *SciMed*, the patents in *Alloc* shared the same specification. The plaintiff in *Alloc* filed a complaint with the United States International Trade Commission ("Commission"), asserting the imported flooring materials infringed upon its patents. The Commission's administrative law judge ("ALJ") found no literal infringement because the locking systems of the imported products did not include "play."

None of the asserted claims in *Alloc* contained the term "play." Nonetheless, the Federal Circuit in *Alloc* found the specification taught "the invention as a whole, not merely a preferred embodiment, provides for play in the positioning of floor panels." 342 F.3d at 1369. The specification provided the presence of play in the system allowed for faster assembly and disassembly without damaging the panels. Furthermore, the specification criticized prior art flooring systems, which lacked play, making disassembly and reassembly of the prior art systems unfeasible. In addition, the court found all of the figures and embodiments either implied or expressly disclosed play. *Alloc*, 342 F.3d at 1370. On these bases, the court concluded the patents described only flooring systems and methods with play. *Id.* The court explained:

> In so concluding, this court recognizes that it must interpret the claims in light of the specification, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (*en banc*), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), yet avoid impermissibly importing limitations from the specification. *Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.Cir. 1998). That balance turns on how the specification characterizes the claimed invention. *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir.2003). In this respect, this court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment. For example, it is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention. *Teleflex, Inc.*

*v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed.Cir.2002). On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir.2001).

*Id.*

■ Turning to the patents-in-suit, the Summary of the Invention provides, "[a] feature of the new method of *this invention* ... includes photographing the selected scene so that the actual height of the scene photographed is substantially the height of the camouflage system." '131 Patent, col. 3, *l.* 31–36 (emphasis added). As in *SciMed*, the use of "this invention" constitutes strong evidence the scope of the claims are limited. *See SciMed*, 242 F.3d at 1343. "Where the preferred embodiment is described as the invention itself, the claims are not entitled to a broader scope than that embodiment." *Id.* If the actual height of the natural scene photographed is substantially the height of the camouflage system, it follows the camouflage system will not consist of repeated patterns smaller than the height of the camouflage system.

Likewise, the Figure 4 flow chart illustrates "the *overall method* used to design and create a camouflage system in accordance with *the present invention*." (emphasis added) '131 Patent, col. 4, *l.* 10–12. Once again, under *SciMed*, the use of "the present invention" is a potent indication the claims are limited. A critical step in the process Figure 4 illustrates requires the operator to "compare [the] resulting representation with [the] original photograph to ensure proper pattern registration and continuity from one article of clothing to the next." Hence, the operator

judges continuity not in a vacuum, but by reference to the original photograph. Notably, the original photograph remains the touchstone regardless of whether the image has been "enhanced" in a prior step. Given the operator determines alignment by reference to the original photograph, the clear implication is the operator has attempted purposely to align the individual visual elements of the two different portions of the original photograph.

This construction stays true to the claim language. The claims clearly delimit that which must "appear substantially continuous." All of the claims provide the first and second imprinted portions of the same photographic image must appear substantially continuous when the articles are worn together. The claims speak consistently of "a portion" (or "first portion") from a photographic image and a "second portion" of the *same* ("said") photographic image. Thus, the claims specify the use of two *different* portions from the same photographic image. It is the two different portions of the same photographic image which must be located, aligned, or correlated to create the appearance of realism and substantial continuity across adjacent articles. Coincidental alignment of a repeated image across garments does not fit within the scope of the claims.

■ In another parallel to *SciMed*, the patents-in-suit criticize prior art camouflage clothing patterns which consist of "repeated patterns." The Background describes prior art camouflage clothing as using "a repeated pattern of a particular hue or shade." 131 Patent, col. 1, *l*. 19. The Background then criticizes the prior art repeating patterns because they "do not adequately mimic the intended environment due to the unrealistic nature of the patterns." 131 Patent, col. 1, *l*. 27–29. Moreover, prior art repeating patterns "do not adequately mimic the intended envi-

ronment due to ... the discontinuity in camouflage pattern from one item of clothing, such as pants, to another item of clothing, such as a shirt." '131 Patent, col. 1, *l*. 27–31. Most significantly, the Background's "discontinuity" criticism can only be attributed to the "repeated pattern" facet of prior art, as the "hue or shade" does not affect continuity. As *SciMed* instructs, claims should not be read so broadly as to encompass distinguished prior art. 242 F.3d at 1343. For this additional reason, the patents-in-suit do not encompass repeating patterns.

■ Embs attempts to distinguish *SciMed* and *Alloc.* First, Embs contends the patents-in-suit expressly reserve additional embodiments. The specification states: "Although this invention is described in terms of specific embodiments, it is not limited thereto, as would be understood by those skilled in the art, numerous variations are possible within the scope of the invention, without departing from the scope and nature thereof." '131 Patent, col. 6, *l*. 16–20. The patents in *SciMed* contained a similar generic reservation: "Although the present invention has been described with reference to preferred embodiments, workers skilled in the art will recognize that changes may be made in form and detail without departing from the spirit and scope of the invention." U.S. Patent No. 5,156,594, col. 14, *l*. 29–34. The court in *SciMed* nonetheless held the scope of the asserted claims was limited to catheters with coaxial lumen structures. 242 F.3d at 1340. This Court similarly concludes the generic reservation in '131 does not preclude a finding that the scope of the claims is limited to a single embodiment.

Furthermore, Embs maintains permissive language such as "by way of example," "such as," and "may" in the specification indicates the patentee contemplated

other embodiments. Defendants argue Embs' examples of permissive language are inapposite. The Court agrees, as none of the examples Embs references give any indication the scope of the claims includes repeated patterns.

■ Embs asserts nothing in the patents-in-suit or the prosecution history indicates a "visually imperceptible" repeating pattern would not satisfy the only limits which the claims place on the camouflage system; namely, it must be comprised of photographic images; appear realistic; and appear substantially continuous. The Court rejects Embs' argument. Embs' assertion concerning the scope of the claims is inaccurate because it fails to account for the fact that the claims specify two different portions of the same photographic image which must be located, aligned, or correlated to create the appearance of realism and substantial continuity across adjacent articles. Moreover, the claims must not be read in a vacuum. Here, the specification's references to "this invention" and "the present invention," as well as the criticism of prior art repeating patterns, make clear "the claimed invention is narrower than the claim language might imply." *Alloc*, 342 F.3d at 1370.

■ Lastly, both sides in this conflict seek to bolster their positions by way of extrinsic evidence. Embs avers the testimony of inventor William Wilkinson verifies that a digital photograph could be built up from separate elements from different photographs. Wilkinson Depo. at 197–98. Defendants maintain the inventors'[2] testimony confirms defendants' analysis of the claim language and specification as limiting the invention to a single photographic image, and excluding repeating patterns. *See id.* at 84. The Court, however, finds

the intrinsic evidence is clear, and resorting to less reliable extrinsic evidence is unnecessary. Furthermore, much of the testimony offered by the parties is ambiguous, the product of excessively leading questions, or both. As such, the testimony does not provide a basis for altering the conclusions reached from an examination of the intrinsic record. Likewise, the Court finds nothing in the prosecution history detracts from the above analysis.

In its simplest terms, the invention entails a realistic appearing camouflage system made by photographing a natural scene and imprinting portions of the resulting photographic image on multiple articles of clothing such that the scale of the natural scene to the imprinted image is approximately one to one, and the portions of the imprinted photographic image align and appear substantially continuous across articles as judged by comparison to the original photograph. The Court concludes a person of ordinary skill in the art would understand the claim terms of the patents-in-suit to require the actual height of the natural scene photographed to be substantially the same height as the camouflage system. Such a person would further understand the claims to require two different imprinted portions of the same photograph to appear substantially continuous across adjacent articles as judged by reference to the original photograph. For all of the above reasons, the Court holds the patents-in-suit do not encompass camouflage patterns which repeat within the camouflage system.

### B. U.S. Patent No. 5,924,131

#### 1. Claim 1

Claim 1 of the '131 Patent states as follows:

---

2. Defendants maintain Jeff Bardin was a co-inventor of the patents-in-suit. Wilkinson indicated he considered Bardin an inventor. Wilkinson Depo. at 165.

A realistic appearing camouflage system for personal wearing attire in which both the appearance and scale of a natural scene from an environment where the camouflage system is intended to be used is mimicked or enhanced, comprising:

a first article of clothing having imprinted thereon a portion of an image from a photograph of said natural scene in substantially the same scale as said natural scene; and

a second article of clothing designed to be worn with said first article of clothing, said second article of clothing having imprinted thereon a second portion of said photographic image in substantially the same scale as said natural scene, said imprints of said first and second articles being so located thereon that when said first and second articles are worn, said respective imprinted portions of said scene appear substantially continuous and said scene is reproduced both vertically and horizontally.

The parties offer the following interpretations of '131 Patent, Claim 1:

| Claim Language | Embs | JOEL | Cabela's | Bass Pro |
|---|---|---|---|---|
| [a] A realistic appearing camouflage system for personal wearing attire | A camouflage system combining at least two articles of personal wearing attire | The camouflage system involves combining multiple products. The products are "personal wearing attire". The camouflage is realistic in appearance. | Camouflage clothing, in which the camouflage images truly represent a natural setting, nothing artificial or abstract | The camouflage system "combines two articles of personal wearing attire" |
| [b] in which both the appearance and scale of a natural scene from an environment where the camouflage system is intended to be used is mimicked or enhanced, comprising: | where at the distance the system is intended to be viewed, one or more natural objects appear to re-create both the scale and appearance of an area similar to that where the camouflage system is intended to be used, and the appearance of nature is either imitated or improved in value, quality, desirability, or attractiveness, comprising; | The appearance of the natural scene is reproduced and mimicked or enhanced. The scene is reproduced at a one-to-one scale of the original scene to the attire. A scene includes natural objects, such as a tree with a trunk, branches, leaves, and surrounding grass, and other natural objects as they appear in nature. | In which the depiction and the sizes of the objects depicted of a setting existing in nature where the clothing is specifically planned to be worn are closely imitated or have improved lighting, color, or layout, including: | "recreates the realistic appearance of an actual scene from an environment both in terms of its appearance and scale (the objects shown are actual size)" "the scene is from an environment where the camouflage system is intended to be used based upon the collective and preformed intention of the wearer, *the person making* the photograph and the manufacturer" "Mimicked": "imitates the scene by required registration of image portions across adjacent garment pieces" "Enhanced": Unclear. |
| [c] a first article of clothing having imprinted thereon a portion of an image from a photograph of said natural scene; in substantially the same scale as said natural scene; and | a first clothing article bearing a part of an image of the one or more natural objects, such that when viewed at the distance in which the camouflage system is intended to be used, the image portion is of a realistic appearing scale relative to the | a first article of clothing has a portion of an image of a photograph of the scene printed on pattern pieces. The scene is reproduced at a one to one scale of the original scene to the attire. | A first finished garment on which has been applied a part of an image from a photograph of the setting as it exists in nature; All natural objects depicted on the first garment are reproduced in approximately 1–1 scale with the natural objects in | a first article of clothing having imprinted thereon "a first discreet image from a single photograph of an actual scene" "the first discreet image from the single photograph depicts the scene in actual size" |

| | | | | |
|---|---|---|---|---|
| | one or more objects as they appear in nature, | | the setting existing in nature, | |
| [d] a second article of clothing designed to be worn with said first article of clothing, | a second clothing article designed to be worn with the first, | A second article of clothing designed to be worn with the first article of clothing. | A second finished garment planned to be worn at the same time with the first garment; | |
| [e] said second article of clothing having imprinted thereon a second portion of said photographic image in substantially the same scale as said natural scene, | a second clothing article bearing a part of an image of the one or more natural objects, such that when viewed at the distance in which the camouflage system is intended to be used, the image portion is of a realistic appearing scale relative to the one or more natural objects as they appear in nature, | A second article of clothing has a second portion of the image of the scene imprinted on the pattern pieces. The scene is reproduced at a one to one scale of the original scene to the attire. | The second garment on which has been applied a second part from the same photographic image; All natural objects depicted on the second garment are reproduced in approximately a 1–1 scale with the objects in the setting existing in nature; | "a second discreet image from a single photograph of an actual scene" "the second discreet image from the single photograph depicts the scene in actual size" |
| [f] said imprints of said first and second articles being so located thereon that when said first and second articles are worn, said respective imprinted portions of said scene appear substantially continuous | so that when the first and second articles are worn, the image portions appear with no obvious discontinuity at the distance the camouflage is intended to be used, | The imprints of the first portion and the second portion of the photograph of the scene are located such that first portion is substantially continuous with the second portion when worn. "Continuous" is defined to mean "marked by uninterrupted extension in space, time, or sequence." Thus, the first portion of the image of the photograph of the scene on the first article of clothing forms an uninterrupted whole with the second portion of the image of the photograph of the scene on the second article of clothing. | The applied parts being arranged on the garments such that, when the garments are worn, the first and second parts from the photograph reform the image as if almost completely uninterrupted | "appearance of the garment system is measured when the garment pieces are worn together" "the discreet portions of the image of the actual scene are registered across the two garment pieces so that the actual scene is wholly recreated on the garment system" |
| [g] and said scene is reproduced both vertically and horizontally. | either vertically or horizontally. | The scene is reproduced vertically and horizontally on the first article and the second article of clothing such that the camouflage system mirrors the entire scene. | | "the discreet portions of the image of the actual scene are registered across the two garment pieces so that the actual scene is wholly recreated on the garment system." Appears to suggest that the scene is reproduced regardless whether the garment pieces are positioned above and below one another or aside one another when worn. Otherwise: unclear |

### [a] "A realistic appearing camouflage system for personal wearing attire"

■ The Court finds JOEL's proposed interpretation of part [a] of Claim 1 is both accurate and complete in that, consistent with the other claims and the specification, it describes the system as comprised of multiple products. Accordingly, the Court adopts JOEL's construction of part [a] of Claim 1.

### [b] "in which both the appearance and scale of a natural scene from an environment where the camouflage system is intended to be used is mimicked or enhanced"

■ The parties offer varying interpretations of the term "natural scene." Embs avers this term denotes "one or more natural objects." Thus, Embs maintains a single object would be a natural scene, such as a photomicrograph of a small portion of a leaf.[3]

JOEL, relying on the specification, contends natural scene means a setting showing a collection of objects such as a tree with a trunk, branches, leaves, and surrounding grass. JOEL refers to the following language from the specification:

> The first portion of the photographic image might, by way of example, include an upper section of a tree trunk and branches without leaves. A second portion of the photographic image is printed on a second article of clothing such as a pair of pants. The second portion of the photographic image might, by way of example, include a lower section of the tree trunk as well as grass.

'131 Patent, col. 2, *l.* 56–63. The Court, however, declines to read the above-quoted language from the specification as limiting Claim 1 to more than one object because the description is qualified by "might, by way of example." Indeed, a natural scene consisting of a single bare tree branch against a featureless sky would be consistent with language of the claims and the specification. The Court therefore adopts Embs' interpretation of "natural scene" as "one or more natural objects."

■ The Court finds the term "mimicked" is clear when read in the context of the terms "realistic appearing" and "photograph." In context, "mimicked" means "closely imitated." Moreover, the Court finds "scale" means the sizes of the objects depicted are closely imitated.

■ Embs maintains the term "enhanced" means "improved in value, quality, desirability, or attractiveness." Embs' derives this abstract construction from a dictionary definition. Cabela's suggests "enhanced" entails having "improved lighting, color, or layout" based upon the description provided in the specification. *See* '131 Patent, col. 4, *l.* 47–col. 5, *l.* 2. Further, as noted above, the operator judges the success of the camouflage-making process by comparing the resulting representation with the original photograph of the natural scene. "Enhanced" therefore cannot entail manipulation to a degree that would render this crucial comparison futile. For these reasons, the Court adopts Cabela's construction of "enhanced."

■ Bass Pro asserts the following language connotes the collective and preformed intention of the wearer, the person

---

**3.** Since the height of the finished camouflage system is substantially the same as the height of the original natural scene, the camouflage system resulting from a photomicrograph of a small portion of a leaf would presumably be appropriate to conceal a correspondingly small insect.

making the photograph and the manufacturer: "the scene is from an environment where the camouflage system is intended to be used." In other words, Bass Pro argues the camouflage system must be custom made for a specific wearer. In discovery, Embs admitted the term "intended to be used" refers to the intention of the person who wears or intends to wear the camouflage system, the person manufacturing it, and the person who takes the photograph of the scene from the natural environment. The Court does not read the admissions as necessarily meaning the wearer's intention is formed prior to the manufacture of the camouflage system. Rather, the Court finds the admissions are consistent with the manufacturer and photographer anticipating the intent of the wearer. The Court therefore rejects Bass Pro's argument.

### [c] a first article of clothing having imprinted thereon a portion of an image from a photograph of said natural scene; in substantially the same scale as said natural scene

■ JOEL argues "imprinted thereon" means "imprinted on a pattern piece of an article of clothing." JOEL bases its argument on the specification, which describes only the use of pattern pieces. '131 Patent, col. 5, l. 49–63. In addition, Figure 4 depicts *the overall method* used to design and create a camouflage system in accordance with *the present invention.*" '131 Patent, col. 4, l. 10–12 (emphasis added). Figure 4 indicates the operator selects portions of the photographic image and superimposes them onto clothing pattern pieces using apparel pattern software. The Court, however, declines to decide at this juncture whether "imprinted thereon" is limited to "imprinted on a pattern piece of an article of clothing."

The Court finds "in substantially the same scale as the natural scene" means the scene is reproduced at approximately a one to one scale of the original scene to the imprinted image on the articles. This may also be accurately expressed as the imprinted photographic image depicts the scene in approximately its actual size.

Embs contends "substantially the same scale" is to be judged "at the distance the system is intended to be viewed." The intrinsic record does not specify the distance from which the camouflage system is intended to be viewed to determine whether the imprinted image is in "substantially the same scale as the natural scene." Embs relies on extrinsic evidence in the form of the testimony of one skilled in the art, camouflage designer Kevin Carlile:

Q. Okay. At what distance would—is there an optimal distance that you would consider this camouflage pattern to be effective at? Let me give you the background, because what I'm asking you is: Obviously, camouflage is not meant to be inspected like that (indicated)—

A. Correct.

Q.—like 3 inches away or there would be no purpose to camouflage.

A. Uh-huh. If I had to put a number, 20 yards.

Carlile Dep. at 70. The question asks the witness the "optimal" distance at which the camouflage is "effective," as well as the distance at which camouflage is "inspected." As a result of the compound question, it is unclear whether the witness is responding with the same answer to both. The optimal effective distance may or may not be the same as the "distance the system is intended to be viewed" for purposes of judging scale or appearance. Moreover, neither the question nor the answer divulge what aspect of the camouflage system is being inspected at a distance of

twenty yards, or the purpose of the inspection. Carlile was not asked whether he would judge every aspect of all types of camouflage from twenty yards. His use of the qualifying "if I had to" is some indication he would prefer not to pin down a single, "one size fits all" distance.[4]

Embs' use of Carlile's testimony is also at odds with the claims and the specification, which repeatedly emphasize the camouflage system is intended to appear "realistic" in the sense that it mimics a photographic image. Moreover, the Background criticizes prior art which "lacks detail." '131 Patent, col. 1, *l.* 56. Similarly, Embs' claim construction brief distinguishes prior art "that is not capable of mimicking the *subtleties of a natural scene.*" (emphasis added). Brief (Doc. 79) at 22. Sixty feet hardly seems an appropriate distance to discern photographic realism, "detail," or "subtleties." For all of these reasons, the Court finds the above colloquy insufficient to support Emb's proposed interpretation.

### [d]  a second article of clothing designed to be worn with said first article of clothing

The parties' interpretations of part [d] of Claim 1 are similar and closely track the claim language. The Court concludes the plain language of part [d] is clear and requires no interpretation.

### [e]  said second article of clothing having imprinted thereon a second portion of said photographic image in substantially the same scale as said natural scene

The terms in Part [e] of Claim 1 have the same meaning as the same terms used in Part [c]. No further interpretation is required.

[f]  **said imprints of said first and second articles being so located thereon that when said first and second articles are worn, said respective imprinted portions of said scene appear substantially continuous**

The Court has already discussed "appear substantially continuous" in Part III. A., above. In light of the specification, "appear substantially continuous" means the two different portions of the same photographic image of the scene are located, aligned, or correlated on the articles so that when the articles are worn together, the corresponding parts of discreet objects depicted appear whole and without interruption across the articles as judged by comparison to the original photograph. Moreover, since the height of the camouflage system is substantially the same height as the scene, the substantial continuity appears not only across articles, but also from the bottom of the system to the top.

[g]  **and said scene is reproduced both vertically and horizontally.**

Photographic images are, generally speaking, two-dimensional. It is therefore difficult to conceive of a camouflage system using a photographic image of a scene reproduced in only one dimension, either vertical or horizontal. The literal and absurd result would be an invisible line.

The specification sheds some light on the meaning of the term. In the Background it appears in the same context as it does in Claim 1. The Detailed Description of the Preferred Embodiment provides in pertinent part:

> The superimposed images act as the camouflage pattern for the respective

---

4. One might well surmise the most relevant distance is the arm's length between the camouflage system on display in a store and a potential buyer of the system.

700

pattern piece. The superimposition of the resulting digital image onto the pattern pieces should be such that when the pattern pieces are assembled into finished articles of clothing comprising the camouflage system 1, the camouflage system 1 mirrors the resulting digital image both vertically and horizontally. Thus, the camouflage pattern is properly registered so that it is continuous, or correlated, from one article of clothing to the next article of clothing as illustrated in Fig. 2.

'131 Patent, col. 5, *l.* 22–32. The Court finds that JOEL's proposed instruction comes closest to capturing the apparent meaning of the term in accordance with Claim 1 and the specification: "The scene is reproduced vertically and horizontally on the first article and the second article of clothing such that the camouflage system mirrors the entire scene."

### 2. Remaining Claims 3, 9, and 12

The remaining claims of the '131 Patent contain terms which are the same as, or similar to, the terms of Claim 1. The Court ascribes to them the same meaning as the terms of Claim 1.

### C. U.S. Patent No. 5,727,253

The claims of the '253 Patent contain terms which are the same as, or similar to, the terms of Claim 1 of the '131 Patent. The Court ascribes to them the same meaning as the terms of Claim 1 of the '131 Patent.

### IV. Disposition

Based on the above, the Court holds the patents-in-suit do not encompass camouflage patterns which repeat within the camouflage system. Furthermore, the Court interprets the claim terms of the

patents-in-suit as set forth in Part III.B. of this opinion.

**IT IS SO ORDERED.**