ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Innoventor, Inc. ) | ASBCA No. 59903 |
| ) | |
| Under Contract No. FA8224-11-C-0043 ) | |

APPEARANCES FOR THE APPELLANT:   Darrell W. Cook, Esq.
                                 Stephen W. Davis, Esq.
                                   Darrell W. Cook & Associates
                                   Dallas, TX

APPEARANCES FOR THE GOVERNMENT:   Jeffrey P. Hildebrant, Esq.
                                    Air Force Deputy Chief Trial Attorney
                                  Christopher S. Cole, Esq.
                                  Lt Col Kevin P. Stiens, USAF
                                    Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE SWEET
ON THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This is an appeal of a contracting officer's final decision (COFD) rejecting the claim of appellant Innoventor, Inc. (Innoventor) asserting that it was entitled to an equitable adjustment due to defective specifications, undisclosed information, a constructive change, and technical impossibility. Innoventor and the government have cross-moved for partial summary judgment on the constructive change theory only. We grant the government's motion and deny Innoventor's cross-motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

I.     The Contract

1. On 19 April 2011, the United States Air Force issued Solicitation No. FA8224-11-R-0027 for the general design and performance requirements to design and build the replacement for a Dynamic Brake Test Stand (DBTS) (R4, tab 4 at 4). As set forth in the solicitation, the DBTS was intended to be capable of testing the latest version of seven different components of such brake assemblies. These components are referred to as Units Under Test (or UUTs). (R4, tab 1 at 15)

2. During the bidding process, one contractor inquired whether the Air Force would provide drawings of the legacy DBTS that the solicited DBTS would replace. The

Air Force responded, "No, this is a design and manufacture effort for a new product. The Government does not have access to any of the drawings" of the legacy DBTS. (Supp. R4, tab 54 at 3)[1]

3. In response to the solicitation, Innoventor submitted a proposal. In its proposal, Innoventor asserted that it had experience delivering test stands to replace legacy test stands. (R4, tab 7 at 12-15)

4. On 28 July 2011, the Air Force awarded Contract No. FA8224-11-C-0043 (contract 0043) to Innoventor. Contract 0043 was a $357,628 fixed-price contract. (R4, tab 1 at 1)

5. Contract 0043's purchase specification (PS) required that the DBTS "shall be capable of accurately testing" UUTs in accordance with various technical orders (TOs), which provided test protocols and requirements for testing the UUTs (R4, tab 1 at 7-8, 15, tabs 1b-1d). One of the TOs with which the PS required the DBTS to comply was TO 33A2-2-51-1 (R4, tab 1 at 7).

6. TO 33A2-2-51-1 provided instructions for the operation of pressure circuits of the DBTS. In describing that operation, the TO cautioned to "Monitor 33D STATIC TEST PRESSURE gauge (2) closely while making pressure adjustments. Pressure will increase sharply and may result in damage to the item being tested." (App. resp., ex. 8 at 686, 689)

7. The PS required that the new DBTS's accuracy and functionality be the same as—or better than—the legacy DBTS's accuracy and functionality by stating that the primary requirement is that the DBTS "shall be designed to combine the functionality of the current Dynamic Brake Test Stand (see TO 33A2-2-40-1) with increased accuracy, reliability, and automation and hydraulic testing (see TO 16A1-17-4-3, Section 7.2.2) as specified herein" (R4, tab 1 at 9). The PS required "uniform functionality and accuracy" between the new DBTS and the legacy DBTS (R4, tab 2 at 16).

8. The PS required that the new DBTS undergo and pass testing. The PS stated that:

> 4.3 Final Machine Review: At least one month prior to the approved shipping date from the manufacture facility to the destination, a final machine build inspection review at the manufacture facility will be conducted. The review

---

[1] It appears that the contractor posed the question during a 27 April 2011 site visit, and that the answer was provided to the attendees (supp. R4, tab 54). While Innoventor is listed on the sign-in sheet, its representatives did not sign the sign-in sheet.

will include a functional performance test cycle performed on [UUTs]. Items must pass all tests in applicable TOs.

(R4, tab 1 at 16)

9. The PS, as modified,[2] also stated that:

> 4.17 <u>Tests</u>. The [DBTS] shall pass the following tests or shall be rejected....

> 4.17.1 <u>Operational Test</u>. The [DBTS] shall be operated without connection to a UUT to determine functionality. Proper operation of all controls, pumps, adjusting mechanisms, valves, and other accessories shall be verified during the trial period. If the [DBTS] fails it shall not be connected to a UUT until it passes.

> 4.19.2 <u>Performance Tests</u>. The [DBTS] shall perform all test cycles identified in TO 9H2-4-183-3 and 16G1-137-3 related to UUTs listed in Table 3.1 of this PS. The test cycles shall be performed by the Government operator (after onsite training) and verified by the Contractor technician. The UUT shall also be tested on existing test equipment to determine uniform functionality and accuracy. The tests will most likely be performed on the exact same components to ensure continuity between the tests.

(R4, tab 2 at 15-16) "If the [DBTS] fails to pass any test in the requirements of this Purchase Specification it shall be rejected" (R4, tab 1 at 23).

10. The PS incorporated by reference FAR 52.243-1, CHANGES—FIXED-PRICE (AUG 1987) (R4, tab 1 at 34). Under the PS, "Government personnel, other than the Contracting Officers [COs] and authorized Government Representative, may (with CO coordination) observe Contractor operations. However, these personnel may not interfere with Contractor performance or make any changes to the contract." Rather, "[a]ny matter concerning a change to the scope, prices, terms or conditions of this contract shall be referred to the Contracting Officer." (R4, tab 1 at 26)

---

[2] On 21 September 2011, the Air Force modified the 0043 contract to include milestone payments, to include a loan agreement for Government-Furnished Equipment, and to modify the PS (R4, tab 2 at 1).

3

II.    Performance

11. At a kickoff meeting, the Air Force technical team presented a slide indicating that:

> You are hereby notified that this team DOES NOT have the authority to direct you in any way to alter your contractual obligations. Further, if the Government, as a result of the information obtained from today's discussion DOES desire to alter your requirements, changes will be issued in writing and signed by the contracting officer. You should take no action on any change unless and until you receive such a contract modification.

(R4, tab 8 at 9)

12. In the summer of 2013, Innoventor began testing the new DBTS using UUTs provided by the government. Charles Wolfersberger, Innoventor's Senior Mechanical Technical Lead Engineer, emailed Daniel Hansen, the Air Force's process engineer point of contact. In that email, Mr. Wolfersberger stated that "[w]e have tested 4 gear cases and have found two units with traces showing near identical input and output torque which suggests that the units do not pass the proof load test." (R4, tab 11 at 1-2)

13. In September 2013, Mr. Hansen traveled to Innoventor's facility for the performance of the Initial Operational Testing & Evaluation (September 2013 IOT&E). The first UUT did not fit the test stand, and the DBTS "failed to run properly and destroyed the [second] UUT." Innoventor tested the remaining UUTs without incident. Moreover, "0 of 5 UUTs passed tests." (R4, tab 14 at 2) However, Mr. Hansen could not make sense of all the test results.

14. Mr. Hansen concluded that Innoventor was "not even close to prepared. Not a single task was successfully completed.... Based on our findings it is estimated that [Innoventor] has a slim hope of successfully completing this contract." Mr. Hansen recommended that the government deliver a cure notice, and allow Innoventor to attempt to correct the deficiencies. Another IOT&E then would be required. If Innoventor could not cure, Mr. Hansen recommended termination. (R4, tab 14 at 4)

15. On 17 September 2013, Mr. Hansen sent Innoventor a list of action items that needed to be addressed on the DBTS. Among the items was the following:

> 0 of 5 UUTs were successfully tested. It is unclear what your intended corrective action entails, but this is a serious concern. The contract clearly stated the [UUTs] shall be

4

tested in accordance with the applicable technical orders. If the test stand cannot meet this most critical design requirement then the test stand cannot be accepted.

(R4, tab 15 at 4) (Emphasis omitted)

16. On 19 November 2013, Mr. Wolfersberger emailed Mr. Hansen a report card on Innoventor's testing of five UUTs. The report card stated that the DBTS broke one UUT, and that the other four UUTs failed at least one test. Mr. Wolfersberger concluded that "I am hoping for a better looking report card with the new Class A assets." (R4, tab 18 at 1)[3]

17. The Air Force sent Innoventor six Class A UUTs, which Innoventor received and tested in late November 2013 (gov't mot., attach. 4 at 1). In a 27 November 2013 report card, Mr. Wolfersberger indicated that one UUT broke, three UUTs failed at least one test, and the remaining two UUTs received marginal or passing scores on all of the tests (R4, tab 19 at 1).[4]

18. In December 2013, Mr. Hansen again traveled to Innoventor for an IOT&E (December 2013 IOT&E). Innoventor resolved most of the action items. However, the DBTS damaged one UUT, and "none of the UUT's were passing the tests even though they were supposed to be 'A' condition assets." Thus, Mr. Hansen concluded that "[w]ith the exception of not having any of the UUTs pass testing, and the damage that was done to some of the UUTs, indications are that the test stand is functioning properly." Mr. Hansen decided that the Air Force would test the same UUTs on the legacy DBTS to determine the true condition of the UUTs. Mr. Hansen wrote that his recommendations:

> [D]epend heavily on the outcome of the testing we conduct this week on the UUTs with the legacy test stand here at Hill AFB. If testing reveals that the UUTs are faulty, then we should no longer suspect the new test stand of being

---

[3] A Class A asset is a serviceable asset without qualification, which means that it is new, used, repaired, or reconditioned material which is serviceable and issuable to all customers without limitation or restriction (gov't mot., attach. 5).

[4] The November 2013 tests were different from, and in addition to the IOT&Es, in that Air Force personnel did not attend the November 2013 tests. It is unclear whether the UUT that the 19 November 2013 report card indicated was broken was the same UUT that broke during the September IOT & E (*compare* R4, tab 14, *with* R4, tab 18). However, it is clear that the UUT that the 27 November 2013 report card indicated was a new break (i.e., occurred during the 27 November 2013 testing) because the Air Force sent new UUTs for the 27 November 2013 tests (gov't mot., attach. 4 at 1), and Innoventor got through three tests before the new UUT broke (R4, tab 19 at 1).

5

faulty. If the test results are not similar to those of the [Innoventor] test stand then we'll need more time to resolve the issues. That process will likely require more information that we currently do not have. [Innoventor] has designed and built the test stand to meet the requirements with the information they were given. I felt that there was information that the government was unable to provide to [Innoventor] that would be helpful, but it was information that we did not have and it was uncertain whether it was required.

(R4, tab 20 at 2-3)

19. On 5 December 2013, Mr. Hansen signed a document indicating that "[w]e agree that the Dynamic Brake Test Stand IOT&E activities have been satisfactorily completed" (app. resp., ex. 6 at 3). Mr. Hansen claims he signed the document for Innoventor's internal purposes, and that he thought the tests were complete enough to seek progress payments, but that the DBTS remained deficient because it did not meet the contractual requirements (gov't reply, attach. 14 at 1).

20. Mr. Wolfersberger traveled to Hill Air Force Base to observe the testing of the UUTs that had been tested on Innoventor's DBTS and on the legacy DBTS. On 10 December 2013, Mr. Wolfersberger sent an email summarizing the first day of testing, during which the Air Force tested two UUTs. The first UUT—which had passed three out of eight tests using Innoventor's DBTS—passed seven out of eight tests on the legacy DBTS. The second UUT passed two out of the eight tests on both DBTSs. (Supp. R4, tab 120 at 1)

21. Mr. Hansen forwarded that email to other Air Force personnel. In the forwarding email, Mr. Hansen stated that, while "it appears as though the two [DBTSs] are further apart[,] [i]n reality, I think the results on the two [DBTSs] are very reasonable and maybe a little closer than I even expected." Mr. Hansen also stated that modifying the Innoventor DBTS to reduce inertia—which the parties were discussing— "should lessen the likelihood of breaking a" UUT. (App. resp.., ex. 1 at 429)

22. After the completion of testing on the legacy DBTS, Mr. Hansen sent an email discussing the results *vis-a-vis* Innoventor's DBTS on 12 December 2013. Mr. Hansen summarized that "I'll just say this up front – the results are VERY similar to those we collected with the Innoventor test stand last week." (Supp. R4, tab 121 at 1, *see also id.* at 2 (reiterating that "Innoventor test stand and Hill's legacy test stand produced very similar results.")) Mr. Hansen stated that, if the legacy DBTS "inertia is much smaller than [Innoventor's] inertia it may explain why their test stand has broken [UUTs] at such a high rate. If there is a drastic difference we'll likely make modifications to the input and output shafts to reduce their inertia." (*Id.* at 2)

23. The 12 December 2013 email also stated that "[w]e got halfway through testing at Hill when the gearcase broke a gear tooth and cracked the housing just like" the UUT that Innoventor's DBTS had broken (supp. R4, tab 121 at 2). In a declaration submitted in support of the government's summary judgment motion, Mr. Hansen suggests that the UUT might have been damaged during the prior week's testing on Innoventor's DBTS. Historically, the UUTs damaged by the legacy DBTS were "very minimal." The single instance of the legacy DBTS damaging an UUT of which Mr. Hansen was aware occurred in 2008. (Gov't reply, attach. 15 at 1)

24. On 13 December 2013, Mr. Hansen sent an email to other Air Force personnel and Mr. Wolfersberger reiterating that he was "seeing consistent results" on most of the tests. However, Mr. Hansen stated that he and Innoventor were "trying to figure out why their test stand is cracking [UUTs] at a higher rate." In particular, they were looking at inertia and spring rates. (App. resp., ex. 1 at 431)

25. On 18 December 2013, Mr. Wolfersberger sent Mr. Hansen an email stating that, "[t]he more I look into this, the more important that spring rate is to this test. The spring will have the effect of lengthening the time it takes to decelerate the spinning components and will therefore lower the torques and stresses imposed on the UUT. This is a huge 'discovery.'" Mr. Hansen responded, "[o]ur previous engineer, Jay Ostler, had brought this up due to the requirement he found in the ATP—I guess we shouldn't have dismissed it. We're working through the issues in a manner that makes sense to us, and it just happens that the focus can now be shifted to include the spring rate." Mr. Wolfersberger also stated that tuning a spring-mass system was a "sorcerer's art," and that "the best approach will be to match the legacy stand's characteristics as much as practical. I do not feel comfortable deviating much from the spring rates that we have determined." (R4, tab 22 at 1)

26. Mr. Hansen then emailed Innoventor, stating that "I spoke with my contracting officer about what it would take to modify the contract for the spring rate design changes." Mr. Hansen asked for a quote on what it would take to make the modification. (App. resp., ex. 2 at 440)

27. On 6 January 2014, Mr. Hansen emailed Mr. Wolfersberger a proposed modification. In the cover letter, Mr. Hansen stated that:

> As part of the modification to address the spring rate the contracting officer is requiring me to modify the purchase specification to align with our changes, as well as provide a narrative of why these changes are necessary. I have attached a modified PS and would like some feedback

from you. I don't think the CO would like the idea of me getting your feedback, but I think it makes the most sense if you agree that it is clearly stated.

(R4, tab 24 at 1) The cover letter continued that:

> I can't come out and specifically say something like "the test stand shall have a spring rate of 30,000 in-lbs/rad" or "the inertia of the system shall be 0.2348 in-lbs-sec^2" - mostly because I'm not convinced that we're sure what it should be. I also should avoid putting specifics in there because the contracting office does not like that type of requirement. The government almost always tries to provide the requirement and not the design criteria. This can be considered either, depending on who's defining it. As a side note, I know you guys are working towards replicating the inertia and spring rate found on the legacy equipment – that's fine. That's probably the right answer, but I'm not going to say it is the right answer for certain.

(R4, tab 24 at 1)

28. The proposed modification attached to Mr. Hansen's letter included the following:

> 4.3 ~~Final Machine Review~~Initial Operational Test & Evaluation (IOT&E). At least one month prior to the approved shipping date from the manufacture facility to the destination an IOT&E~~final machine build inspection review~~ at the manufacture facility will be conducted. The ~~review~~IOT&E will include a functional performance test cycle performed on Government furnished components (Listed in 3.4) determined at the meeting identified in section 4.2. Items must pass all tests in applicable TOs. In addition to passing the specific TO tests, the Government must be satisfied that the [DBTS] is 100% functional and is capable of performing all of said tests in a safe manner – safe with respect to personnel and safe with respect to the condition of the UUTs. Since the [DBTS] shall replicate the testing capabilities of the original Dynamic Break Test Stand the [DBTS] shall not damage UUTs as a result of testing. The Government Project Manager

8

> will have the authority to determine whether the [DBTS] design is performing the tests in an acceptable manner. This includes parameters which are otherwise undefined in the technical data, such as system inertia and spring rate.

(R4, tab 24 at 11)[5]

29. In response to the proposed modification, Innoventor submitted a proposal to adjust the spring rate for $163,230 in February 2014 (R4, tab 25 at 12). Innoventor also submitted a request for equitable adjustment (REA), asserting that, due to "instability of expectations," it was entitled to $893,358 in extra costs it incurred through December 2013 (*id.* at 1, 13). Innoventor never fully defined the term "instability of expectations," which we take to mean changes in the contract's performance specifications during performance (*id.* at 2).

30. On 18 February 2014, the CO sent an email to Innoventor stating that the REA was incorrectly being invoked because the government had not issued a modification directing a change. Moreover, the CO stated that:

> I cannot accept a proposal for a submitted change as the government has not provided any amended purchase specification for you to propose to. The engineer does not have the authority to amend the purchase specification and ask for proposals when making changes to the contract. Any issue that could change the 'scope' or falls outside what was part of the original contract must be worked through the contracting officer.

(R4, tab 26 at 1)

31. On 27 March 2014, Mr. Hansen sent an email to other Air Force personnel providing a history of contract 0043. Mr. Hansen stated that "[t]he PS written by 309 CMXG/ENH is not perfect and there are some potential gray areas of interpretation." (R4, tab 3 at 172-73) Mr. Hansen also stated that Innoventor failed the September 2013 IOT&E. Regarding the December 2013 IOT&E, Mr. Hansen stated that "[c]ontract requirements met, other than the test stand is cracking gear teeth on some gearboxes being tested." Mr. Hansen stated that Innoventor was proposing to fix the problem for $163,230, but that the changes could be done for much less—about $20,000—because Innoventor's "test stand is quite good and the required changes,

---

[5] The edits in the above quotation—i.e., the underlined proposed additions and the strike-through proposed deletions—are the Air Force's proposed modifications to the 0043 contract.

9

although they have significant impacts, are relatively minimal." Thus, Mr. Hansen indicated, the plan was to have Innoventor deliver the DBTS "as-is," pay the contract price of $356,378, and make the necessary changes in-house. (R4, tab 3 at 173)

32. In the summer of 2014, Innoventor generated an Acceptance Test Procedures form. On the form, it appears that Mr. Hansen initialed that the DBTS passed various operational and safety characteristics. Nothing on the form indicates that the DBTS did not break UUTs. (App. resp., ex. 7 at 377-411)

33. In a memorandum from 2014, Mr. Hansen stated that the test requirements are defined by certain RPM and a certain torque measurement on the input and output of the UUTs, but "[t]here are no other design or test criteria available." He continued:

> Even though the speed and torque sensors indicated measurements within the acceptable ranges, several [UUTs] have cracked gears while being tested on [Innoventor]'s test stand. All engineering personnel...believe that the combined spring rate of the test stand components is too high (too rigid) and that is causing a faster/harder impact when the brake engages.
>
> We have attempted to resolve the deficiency with [Innoventor] but they have responded with a Request for Equitable Adjustment.... Their claims are unsupported.
>
> **RECOMMENDATION**
> 309 CMXG/ENH believes that it is in the best interest of the government to continue with the project knowing that the spring rate of the test stand is the most likely cause for damage to units under test. It is proposed that we accept the test stand "as-is" and correct the deficiency using our own resources. [Innoventor] will still be responsible for all other remaining deliverables. The government will pay the remainder of the full contract price for the test stand. 309 CMXG/ENH believes this is the quickest path towards resolution and completion of this test stand. This will also allow us to distance ourselves from [Innoventor], a company with repeated delays and failures.

(R4, tab 29 at 1)

10

III.    Claim History

34.  On 8 September 2014, Innoventor submitted a certified claim to the CO for $1,138,552.  Innoventor claimed defective specification, undisclosed information, a constructive change, and technical impossibility.  The amount sought in the claim increased relative to the REA because Innoventor added 2014 costs, and applied overhead to costs by each calendar year.  (R4, tab 46)

35.  On 8 January 2015, the CO issued a COFD, denying the claim.  In addressing the constructive change claim, the CO stated that:

> The requirement has always been to replicate the test
> results of the legacy test stand.... The Government
> believes the legacy test stand was designed with careful
> consideration to the operating conditions and test
> parameters that are no longer openly stated in the
> documentation available.  In other words, even though
> parameters such as inertia are unknown, they can be
> calculated through reverse-engineering efforts to replicate
> the characteristics of the legacy test stand.

(R4, tab 53 at 9)

36.  Innoventor then filed this timely appeal dated 20 March 2015 with the Board.

37.  Innoventor and the Air Force cross-moved for partial summary judgment on entitlement under the constructive change theory.

## DECISION

I.    The Standards for Summary Judgment[6]

Summary judgment will be granted if a moving party has shown that there are no genuine issues of material fact and it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A non-movant seeking to defeat summary judgment by suggesting conflicting facts must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, if the non-moving party carries the burden of proof at trial for elements of its case and fails to provide such proof, the moving party is entitled to summary judgment.  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).  In

---

[6]  Board Rule 7(c)(2) provides that we look to FED. R. CIV. P. 56 for guidance on dealing with motions for summary judgment.

deciding summary judgment motions, we do not resolve controversies, weigh evidence, or make credibility determinations. *Liberty Lobby*, 477 U.S. at 255. Moreover, we draw all reasonable inferences in favor of the non-movant. *Id.* Where, as here, the parties have filed cross-motions for summary judgment, we evaluate each motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (1987); *ECCI-C Metag, JV*, ASBCA No. 59031, 15-1 BCA ¶ 36,145 at 176,419.

II.     The Government's Motion for Summary Judgment

The government is entitled to judgment as a matter of law on the constructive change theory because there is no evidence suggesting an authorized government representative required Innoventor to perform work not required under the terms of contract 0043. In order to recover for a constructive change, a contractor must prove that:

> (1) [T]he CO compelled the contractor to perform work not required under the terms of the contract, (2) the person directing the change had contractual authority unilaterally to alter the contractor's duties under the contract, (3) the contractor's performance requirements were enlarged, and (4) the added work was not volunteered, but resulted from the direction of the government's officer.

*Dan Rice Constr. Co.*, ASBCA No. 52160, 04-1 BCA ¶ 32,595 at 161,262. Here, Innoventor appears to claim that the government changed its performance requirements by directing it to replicate the legacy DBTS's performance and test results (app. resp. at 24-25). The government is entitled to judgment as a matter of law on that theory because there is no evidence suggesting that the government changed Innoventor's performance requirements, let alone that anyone with authority to do so directed any such changes.

A.     There is No Evidence Suggesting that the Government Changed Innoventor's Performance Requirements

There is no evidence suggesting that the government changed Innoventor's contract's performance requirements because contract 0043 unambiguously required that the new DBTS pass the tests and function at least as well as the legacy DBTS. "In order to decide whether a constructive change has occurred, we examine the pertinent contract language...to interpret the contract requirements." *Lamb Eng'g & Constr. Co.*, ASBCA No. 53304 *et al.*, 06-1 BCA ¶ 33,178 at 164,417. Where the provisions of a contract are "clear and unambiguous, they must be given their plain and ordinary meaning, and we

12

may not resort to extrinsic evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc) (citations omitted).

"An ambiguity exists when a contract is susceptible to more than one reasonable interpretation." *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004). As we have held:

> Determining whether...differing interpretations are reasonable begins with an examination of the plain language of the contract, construing the contract so as "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." In order to fall within the "zone of reasonableness," a party's interpretation must be logically consistent with the contract and the parties' objectively ascertainable intentions.

*ECCI-C Metag*, 15-1 BCA ¶ 36,145 at 176,418 (citations and quotations omitted).

Here, the only interpretation of contract 0043 that is logically consistent with the contract language and the parties' objectively ascertainable intentions is that the new DBTS had to pass the tests and function at least as well as the legacy DBTS. Contract 0043 plainly stated that the new DBTS "shall pass the following tests or shall be rejected" (SOF ¶ 9). It also stated that the primary requirement for Innoventor's DBTS is that it "shall be designed to combine the <u>functionality</u> of the current Dynamic Brake Test Stand...with increased accuracy, reliability, and automation and hydraulic testing" (SOF ¶ 7 (emphasis added)). Moreover, contract 0043 required "<u>uniform functionality and accuracy</u>" between Innoventor's DBTS and the legacy DBTS (SOF ¶ 9 (emphasis added)). Thus, contrary to Innoventor's suggestion, contract 0043 unambiguously required that the new DBTS pass the tests and function uniformly with the legacy DBTS.

Also contrary to Innoventor's suggestion, there is no genuine issue of material fact but that the new DBTS failed the September 2013 IOT&E test. As Mr. Hansen reported, "0 of 5 UUTs passed tests," and "[n]ot a single task was successfully completed" (SOF ¶¶ 13-14). There is no contradictory evidence suggesting that Innoventor's DBTS passed the September 2013 IOT&E. Therefore, at a minimum, any costs incurred to modify Innoventor's DBTS so that it could pass the follow-up December 2013 IOT&E test cannot be recovered under a constructive change theory because Innoventor incurred those costs to meet the contract's requirement that Innoventor's DBTS pass the tests.

There is evidence that, at a minimum, raises a genuine issue of material fact as to whether Innoventor's DBTS passed the December 2013 IOT&E test in the sense that its

13

accuracy in testing the UUTs under the TOs was comparable to that of the legacy DBTS. In particular, Mr. Hansen stated that (1) the IOT&E had been "satisfactorily completed"; (2) "the two [DBTSs] are very reasonable"; (3) the "results [for the legacy DBTS test] are VERY similar to those we collected" during the December 2013 IOT&E; and (4) he was "seeing consistent results" between the December 2013 IOT&E and the tests on the legacy DBTS. (SOF ¶¶ 19-24)

However, contract 0043 also required uniform functionality (SOF ¶ 7). "Uniform" means "conforming to one...unvarying standard; not different at different times or places...applying to all within a class; sameness." BLACK'S LAW DICTIONARY, 1530 (6th ed. 1990). "Function" means "to perform, execute [or] administrator. The nature and proper action of anything." *Id.* at 673. Thus, in order to comply with the contract's uniform functionality requirement, Innoventor's DBTS had to perform the same as the legacy DBTS. The undisputed evidence shows that Innoventor's DBTS was not performing the same as the legacy DBTS because Innoventor's DBTS was breaking UUTs at a much higher rate than the legacy DBTS. In the 12 December 2013 email, Mr. Hansen complained that Innoventor's DBTS "has broken [UUTs] at such a high rate" (SOF ¶ 22). Likewise, in his 13 December 2013 email, Mr. Hansen stated that they were "trying to figure out why [Innoventor's] test stand is cracking [UUTs] at a higher rate" (SOF ¶ 24). And in his 27 March 2014 email, Mr. Hansen stated that the "[c]ontract requirements [were] met, other than the test stand is cracking [UUTs]" (SOF ¶ 31). Mr. Hansen's 2014 memorandum also stated that "several [UUTs] have cracked gears while being tested on [Innoventor]'s test stand" (SOF ¶ 33). Because the undisputed evidence shows that Innoventor's DBTS was breaking UUTs at a higher rate than the legacy DBTS, there was not uniform functionality between the DBTSs.

In response, Innoventor points to the fact that the legacy DBTS also broke a UUT during testing (SOF ¶ 23). While the government suggests that the UUT could have been broken during testing on Innoventor's DBTS a week earlier, for purposes of deciding the government's summary judgment motion, we must draw the reasonable inference that the legacy DBTS broke the UUT. However, even drawing that inference, that merely would establish that the legacy DBTS broke two UUTs over several years. (SOF ¶ 23) Innoventor's DBTS undisputedly broke four UUTs over several months (SOF ¶¶ 13, 16-18). Thus, the undisputed evidence confirms Mr. Hansen's conclusion that Innoventor's DBTS was breaking UUTs at a higher rate than the legacy DBTS.

Innoventor also argues that the Air Force retroactively tried to change the contract's requirements because the version of TO 33A2-2-51-1 in effect during the IOT&Es, permitted damage to UUTs, but the 2014 proposed modification would have altered that fact by prohibiting such damage (app. resp. at 3-4, 30, 35; app. reply at 5). As an initial matter, TO 33A2-2-51-1 merely warned that damage may result to the

14

UUT if pressure increases sharply as a result of failing to properly monitor the 33D static test pressure gauge. It does not say that such damage is acceptable. (SOF ¶ 6)

In any event, Innoventor's argument is beside the point. As discussed above, the problem with Innoventor's DBTS was not that it broke a UUT. Rather, the problem was the lack of uniform functionality because Innoventor's DBTS broke UUTs at a significantly higher rate than the legacy DBTS. Regardless of whether the unaccepted 2014 proposed modification would have prohibited damage to the UUTs, the PS in effect during testing required uniform functionality and accuracy between the new DBTS and the legacy DBTS.

Innoventor further complains that the Air Force was unsure of the design specifications during performance (app. resp. 31-32; app. reply at 7-8). That complaint ignores the fact that contract 0043 provides performance specifications, not design specifications. "A design specification describes the details of performance while a performance specification only sets forth the end results leaving the contractor the discretion to determine the details of performance to achieve those end results." *Brinderson Corp.*, ASBCA No. 30938, 86-3 BCA ¶ 19,107 at 96,590-91; *see also Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987). Here, contract 0043 did not describe the details of performance. Rather, it only set forth the end result—requiring that the new DBTS be designed to combine the functionality of the legacy DBTS with increased accuracy, reliability, and automation and hydraulic testing—leaving Innoventor the discretion to determine the details of performance to achieve those end results (SOF ¶ 7). Indeed, in response to a question during the bidding process, the Air Force stated that "this is a design and manufacture effort" (SOF ¶ 2, *see also* SOF ¶ 27 ("[T]he contracting office does not like [design specifications]. The government almost always tries to provide the requirement and not the design criteria.")).

Nor is there evidence suggesting that the Air Force imposed design specifications—such as inertia or spring rates—when contract 0043 only contained performance specifications. As we have held:

> To be compensable...the change must be one that the Government ordered the contractor to make. The Government's representative, by his words or his deeds, must require the contractor to perform work which is not a necessary part of his contract. This is something which differs from advice, comments, suggestions, or opinions which Government engineering or technical personnel frequently offer to a contractor's employees.

*Quality Plus Equip., Inc.*, ASBCA No. 46932, 96-2 BCA ¶ 28,595 at 142,759 (emphasis added) (citation omitted).

Here, there is no evidence suggesting that the Air Force required—as opposed to advised, suggested, or opined—that Innoventor meet any design specifications. Innoventor relies upon Mr. Hansen's statement that "[a]s a side note, I know you guys are working towards replicating the inertia and spring rate found on the legacy equipment—that's fine. That's probably the right answer, but I'm not going to say it is the right answer for certain." (SOF ¶ 27 (emphasis added); *see also* app. resp. at 32). As the emphasized language indicates, that statement was, at most, advice, comment, suggestion, or opinion on Innoventor's decision to replicate the DBTS's inertia and spring rate. Mr. Hansen's statement cannot reasonably be read as requiring that Innoventor replicate the legacy DBTS's inertia and spring rate.[7]

Innoventor also relies upon the COFD to demonstrate that the government compelled Innoventor to reverse engineer the legacy DBTS (app. resp. at 18). The fact that the CO issued the COFD after performance precludes a finding that the COFD constituted an order compelling Innoventor to perform work not required under the terms of the contract (SOF ¶ 35). Moreover, the COFD did not require Innoventor to replicate the legacy DBTS. Rather, the COFD stated that the new DBTS had to "replicate the test results of the legacy stand" (*id.* (emphasis added)). The COFD merely stated that replicating the test results "can be" accomplished through reverse engineering (*id.*). The word "can" is permissive, not mandatory. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1378 (Fed. Cir. 2003). Therefore, the COFD merely was advising, suggesting, or opining that Innoventor could have reverse engineered the legacy DBTS, instead of requiring that Innoventor had to reverse engineer the legacy DBTS.

To demonstrate that the contract was ambiguous, Innoventor also relies upon a statement by Mr. Hansen in an internal email that the PS is "not perfect and there are some potential gray areas of interpretation" (app. resp. at 34 (quoting R4, tab 3 at 173, ¶ 5)). It cannot reasonably be inferred from that general statement that Mr. Hansen believed that the PS was unclear about whether the PS required uniform functionality because, in that same email, Mr. Hansen stated that the "[c]ontract requirements [were] met, other than the test stand is cracking gear teeth on some gearboxes being tested" during the December 2013 IOT&E (*id.*) (emphasis added). In any event, extrinsic evidence of internal debates within an agency about the meaning of a contract

---

[7] Mr. Hansen's statement in the 18 December 2013 email that "I guess we shouldn't have dismissed" an earlier suggestion by Mr. Ostler about the spring rate is even less helpful because that merely shows that the Air Force engineering personnel were working with Innoventor in an attempt to help it lower the rate at which its DBTS broke UUTs (SOF ¶ 25; *see also* app. resp. at 5).

provision cannot override the plain language of the contract. *Raytheon Co.*, ASBCA No. 57576 *et al.*, 15-1 BCA ¶ 36,043 at 176,056.

B.  There is Evidence Suggesting that the Person Directing any Changes had Authority To Do So

Alternatively, there is no evidence suggesting that the person directing any changes had authority to alter Innoventor's duties under contract 0043. When a contract expressly provides that only the CO has the authority to change a contract, other government employees do not possess actual express or implied authority to change the contract. *Winter v. Cath-dr/Balti JV*, 497 F.3d 1339, 1345-46 (Fed. Cir. 2007). Here, contract 0043 expressly provided that "[a]ny matter concerning a change to the scope, prices, terms or conditions of this contract shall be referred to the Contracting Officer" (SOF ¶ 10). Likewise, at the kickoff meeting, the technical team reiterated to Innoventor that it did not have the authority to change the contract (SOF ¶ 11). Therefore, Mr. Hansen did not have the authority to alter Innoventor's duties.

Nor does the 6 January 2014 email raise a genuine issue of material fact as to whether the CO directed the purported changes to the contract requirements for which it seeks to recover (app. resp. at 37). In the 6 January 2014 email, Mr. Hansen stated that, "[a]s part of the modification to address the spring rate the contracting officer is requiring me to modify the purchase specification to align with our changes" (SOF ¶ 27). That statement does not evidence the CO ordering Innoventor to perform additional work because the government rejected Innoventor's proposed modification to address the spring rate for $163,230 (SOF ¶ 29). Because the government never issued the proposed modification that the CO had ordered, Innoventor did not perform additional work to address the spring rate pursuant to the proposed modification. Instead, the government accepted the DBTS without the adjustments to the spring rate, and the government performed the spring rate adjustments itself (SOF ¶¶ 31, 33).

Innoventor's argument improperly conflates the unissued proposed modification to address the spring rate with the purported constructive changes for which Innoventor seeks to recover. The 6 January 2014 email states that the CO ordered the unissued proposed modification to address the spring rate is separate from the REA for the purported additional work as a result of the purported "instability of expectations" that forms the basis of the constructive change claim (SOF ¶¶ 27, 29). The 6 January 2014 email does not address the purported additional work as a result of the purported "instability of expectations," much less provide proof that the CO ordered any such work (SOF ¶ 27). On the contrary, in the 18 February 2014 email in response to the REA, the CO stated that he did not order any additional work as a result of purported unstable expectations (SOF ¶ 30). Thus, there is no evidence suggesting that the CO ordered the purported additional work for which Innoventor seeks to recover.

17

III.   Innoventor's Cross-Motion for Summary Judgment

Innoventor is not entitled to judgment as a matter of law because, as discussed above, contract 0043 unambiguously required that Innoventor's DBTS pass the tests and function at least as well as the legacy DBTS, which requirements were not satisfied. Moreover, there is no evidence suggesting that anyone with authority required any changes.

## CONCLUSION

The government's motion for summary judgment is granted. Innoventor's cross-motion for summary judgment is denied. Judgment is entered in the government's favor on the constructive change theory.

Dated:   11 July 2017

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59903, Appeal of Innoventor, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

18